# 24-0370-CV

## United States Court of Appeals

*for the*

## Second Circuit

———————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

73DT BUSINESS ENTERPRISES, LLC, 73D BUSINESS BUREAU, INC.,

*Claimants-Appellants,*

YOSEF MANELA,

*Claimant,*

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR CLAIMANTS-APPELLANTS

RYAN P. POSCABLO
STEPTOE LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

BRIAN A. JACOBS
MORVILLO ABRAMOWITZ GRAND
  IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

*Attorneys for Claimants-Appellants*

CP COUNSEL PRESS    (800) 4-APPEAL • (330235)

– v. –

THE REAL PROPERTY AND PREMISES KNOWN AS 432 NORTH
OAKLAND DRIVE, CONDOMINIUM UNIT 103, BEVERLY HILLS,
CALIFORNIA 90210, and all proceeds traceable thereto, THE REAL
PROPERTY AND PREMISES KNOWN AS 432 NORTH OAKLAND DRIVE,
CONDOMINIUM UNIT 203, BEVERLY HILLS, CALIFORNIA 90210, and all
proceeds traceable thereto, ANY AND ALL FUNDS ON DEPOSIT IN STIFEL
NICOLAUS & CO. ACCOUNT NUMBER ENDING IN 9142, HELD IN THE
NAME OF 7D BUSINESS BUREAU INC., and all proceeds traceable thereto,
ANY AND ALL FUNDS ON DEPOSIT IN CITIZENS BUSINESS BANK
ACCOUNT NUMBER ENDING IN 7135, HELD IN THE NAME OF 7D
BUSINESS BUREAU INC., and all proceeds traceable thereto,

*Defendants.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Claimant-Appellant 7D Business Bureau, Inc. states that it does not have a corporate parent and that there is no publicly held corporation that owns 10% or more of its stock.  Claimant-Appellant 73DT Business Enterprises, LLC[1] states that 7D Business Bureau, Inc. is its sole member.

---

[1] The correct name of this entity is "73DT Business Properties, LLC."  (A-79, 120.)  This brief uses "73DT Business Enterprises, LLC" because that is the name of the entity as it appears on the notice of appearance filed in the District Court (A-56), and is the name that appears on docket sheet both in the District Court (A-2) and in this Court.

## **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES........................................................................ iv

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF JURISDICTION ..........................................................8

ISSUES PRESENTED................................................................................8

STATEMENT OF THE CASE...................................................................9

STATEMENT OF FACTS .......................................................................14

    A.     The Claimant Entities .............................................14

    B.     The Indictment .......................................................15

    C.     The Forfeiture Complaint .......................................16

    D.     The Claims and the Motion to Dismiss ..................17

    E.     The Government's Motion to Strike ........................18

    F.     The District Court's December 11, 2023 Order and
          March 25, 2024 Opinion .......................................21

SUMMARY OF ARGUMENT.................................................................26

STANDARD OF REVIEW ......................................................................28

ARGUMENT ...........................................................................................31

    POINT I

    The District Court Abused Its Discretion By Granting the Government's
    Motion To Strike On Clearly Erroneous Findings of Fact and a
    Misapplication of Governing Law.................................................31

    A.     The District Court's Conclusion that Derkach Has A Current
          Interest in the Assets Is Based on a Clearly Erroneous View
          of the Evidence .......................................................31

    B.     The District Court's Conclusion that Terekhova Is Deliberately
          Avoiding the Jurisdiction of the United States Is Based on Clearly
          Erroneous Findings..................................................34

    C.     The District Court's Conclusion that Terekhova Is Not Confined
          Elsewhere Is Not Supported and Cannot Be Squared with
          Governing Law .......................................................43

D.    The District Court's Conclusion that Terekhova Has Knowledge of the Indictment Against Her Is Based on a Clearly Erroneous View of the Evidence ............................................................... 46

POINT II

The District Court Abused Its Discretion By Failing to Conduct the Required Discretionary Analysis ................................................................. 48

POINT III

The District Court Violated Claimants' Due Process Rights By Failing to Rule on Claimants' First-Filed Motion To Dismiss ................................. 51

CONCLUSION ............................................................................................ 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Collazos v. United States*,
  368 F.3d 190 (2d Cir. 2004) ................................ 23, 26, 28, 30, 44, 45, 49, 50, 53

*Degen v. United States*,
  517 U.S. 820 (1996) ........................................................................... 51, 52

*In re Hijazi*,
  589 F.3d 401 (7th Cir. 2009) ................................................................. 55

*Otal Invs. Ltd. v. M/V CLARY*,
  673 F.3d 108 (2d Cir. 2012) ................................................................. 30

*Ramirez v. T&H Lemont, Inc.*,
  845 F.3d 772 (7th Cir. 2016) ................................................................ 29

*Schlaifer Nance & Co. v. Est. of Warhol*,
  194 F.3d 323 (2d Cir. 1999) ................................................................. 34

*United States v. 2005 Pilatus Aircraft*,
  No. 12-CV-223 (NGR), 2016 WL 7230209 (S.D. Tex. Jan. 25, 2016) .............. 38

*United States v. $263,327.95*,
  936 F. Supp. 2d 468 (D.N.J. 2013) ....................................................... 52

*United States v. $40,877.59 in U.S. Currency*,
  32 F.3d 1151 (7th Cir. 1994) ......................................................... 37, 52

*United States v. $525,695.24 Seized from JP Morgan Chase Bank Investment
  Acct #74068415*,
  No. 13-CV-1455 (DCN) (N.D. Ohio) ...................................................... 29

*United States v. $610,210 in United States Currency*,
  No. 21-CV-4854 (KPF), 2022 WL 1125980 (S.D.N.Y. Apr. 15, 2022) .............. 50

*United States v. $6,976,934.65, Plus Interest Deposited into Royal Bank of
  Scotland Int'l, Acct. No. 2029-56141070, Held in Name of Soulbury Ltd.*,
  554 F.3d 123 (D.C. Cir. 2009) ......................................................... 41, 46, 48

*United States v. A Red Volvo Tractor*,
  No. 23-CV-751 (BKS), 2024 WL 1345526 (N.D.N.Y. Mar. 29, 2024) ........ 52, 53

iv

*United States v. All Funds on Deposit in Lee Munder Wealth Planning Resource Account,*
137 F. Supp. 3d 125 (D. Mass. 2016) ...................................................53

*United States v. Bescond,*
24 F.4th 759 (2d Cir. 2021) ............................................ 7, 41, 42, 51

*United States v. Biba,*
395 F. Supp. 3d 227 (E.D.N.Y. 2019) .....................................................51

*United States v. Chimurenga,*
760 F.2d 400 (2d Cir. 1985) ............................................................29

*United States v. Cornelson,*
595 F. Supp. 3d 265 (S.D.N.Y. 2022) ...................................................51

*United States v. Derkach,*
No. 22-CR-432 (DLI) (E.D.N.Y.) ...........................................10, 11, 15

*United States v. JP Morgan Chase Bank,*
No. 13-CV-1363 (LEK), 2015 WL 1820042 (N.D.N.Y. Apr. 22, 2015) ............52

*United States v. Mondragon,*
313 F.3d 862 (4th Cir. 2002) ...........................................................53

*United States v. One Gulfstream G-V Jet Aircraft,*
941 F. Supp. 2d 1 (D.D.C. 2013) .......................................................55

*United States v. One Tyrannosaurus Bataar Skeleton,*
No. 12-CV-4760 (PKC), 2012 WL 5834899 (S.D.N.Y. Nov. 14, 2012) ............53

*United States v. Premises & Real Prop. at 4492 S. Livonia Rd.,*
889 F.2d 1258 (2d Cir. 1989) ..........................................................52

*United States v. Salti,*
579 F.3d 656 (6th Cir. 2009) ...................................................... 38, 49

*United States v. Technodyne LLC,*
753 F.3d 368 (2d Cir. 2014) ....................................................... *passim*

*United States v. Two Condominiums,*
No. 21-CV-4060 (CRB), 2021 WL 3810273 (N.D. Cal. Aug. 26, 2021) ............55

*United States v. Won,*
No. 22-2716, 2024 WL 827774 (2d Cir. Feb. 28, 2024)......................................39

v

**Statutes:**

18 U.S.C. § 981 .................................................................................9

18 U.S.C. § 983 ...............................................................................29

18 U.S.C. § 1956 ........................................................................ 9, 54

18 U.S.C. § 1957 ........................................................................ 9, 54

18 U.S.C. § 1344 ........................................................................ 9, 54

21 U.S.C. § 853 ...............................................................................29

28 U.S.C. § 1291 ..............................................................................8

28 U.S.C. § 1345 ..............................................................................8

28 U.S.C. § 1355 ..............................................................................8

28 U.S.C. § 2466 ..................................................................... *passim*

31 U.S.C. § 5335 ...................................................................... 10, 54

50 U.S.C. § 1705 .............................................................................10

**Rules:**

Rule 8 of the Federal Rules of Civil Procedure ................................................... 7, 52

Rule G of the Supplemental Rules for Admiralty and Maritime Claims and
    Asset Forfeiture Actions ........................................ 7, 18, 52, 53, 54, 55

## PRELIMINARY STATEMENT

The District Court in this civil forfeiture action abused its discretion by disentitling two corporate entities — Claimant-Appellants 7D Business Bureau, Inc. ("7D") and 73DT Business Enterprises, LLC ("73DT, " and together with 7D, the "Claimants") — from their legitimate claims to property without holding the government to its burden to show that Claimants come within the scope of the fugitive disentitlement statute, 28 U.S.C. § 2466.  The District Court committed four fundamental errors in its Memorandum & Order granting the government's motion to strike Claimants' claims (SPA-1 (the "Opinion")), each of which constitutes an independent basis for reversal.[2]  If allowed to stand, the District Court's fatally flawed Opinion will have the effect of reducing the government's evidentiary burden to establish fugitive disentitlement in the civil forfeiture context virtually to zero, and thereby empower the government to take the extraordinary step of extinguishing valid claimants' property rights on the basis of almost no evidence and without having met its obligations under governing law.

The government's theory of forfeiture in this case rests principally on its allegations that Claimants' assets — two condominium units purchased in 2013 and the seized contents of two bank accounts used to purchase and maintain the

---

[2] "SPA" refers to the special appendix filed with this brief.  "A" refers to the joint appendix filed with this brief.

units (collectively, the "Assets") — were involved in violations of U.S. sanctions imposed against Andrii Derkach in September 2020, seven years after the bank account funds used to acquire and maintain the condominium units were deposited into a U.S. financial institution. No allegations or evidence suggests, however, that Derkach has any interest in Claimants or the Assets; nor were the Assets themselves ever blocked. The government has focused instead on Oksana Terekhova, Derkach's ex-wife, who has not been sanctioned and is not alleged to have been involved in the activity for which Derkach was sanctioned. Nor is Terekhova the titled owner of any of the Assets. Rather, the Assets are owned by Claimants — the condominiums are owned by 73DT, which is owned, in turn, together with the defendant bank account funds, by 7D, of which Terekhova is the sole shareholder. The District Court thus erred to the extent it struck Claimants' claims on the basis of Derkach's purported "interest" in Claimants.

In order to strike Claimants' claims over the Assets on the basis of their affiliation with *Terekhova* pursuant to 28 U.S.C. § 2466(b) (which extends disentitlement to a claim "filed by a corporation if any majority shareholder . . . is a person" to whom the statute applies), the government was required to establish, among other things, (1) that Terekhova is deliberately refusing to reenter the United States with the specific intent to avoid criminal prosecution, (2) that Terekhova is not in custody in a foreign jurisdiction, and (3) that Terekhova had

2

knowledge of the criminal indictment against her. The District Court wrongly concluded — after adjourning and then canceling a scheduled conference at which it could have taken the necessary evidence and tested the government's untenable positions — that the government established each of these elements. The District Court's conclusion was based on a clearly erroneous assessment of the facts and a misapplication of this Court's governing law.

*First*, with respect to deliberate avoidance, the District Court concluded that Terekhova is deliberately avoiding the United States to evade criminal charges against her on the sole basis that, although Terekhova visited the United States on multiple occasions in past years, she has not visited the United States since January 2020. That mere alleged "change" in travel behavior, however, is insufficient for the government to show Terekhova's specific intent to avoid criminal prosecution, as required, because Terekhova's travel behavior actually "changed" nine months *before* Derkach was sanctioned (in September 2020) and three years *before* Derkach's indictment was unsealed (in December 2022) and Terekhova was indicted (in January 2023), and therefore cannot be attributed either to the sanctioning or the criminal case. Nor is there any suggestion in the record that, for example, Terekhova had recent plans to return to the United States but chose not to do so *after* Derkach was sanctioned or Terekhova was indicted. The District Court further compounded its error by failing entirely to consider Terekhova's plainly

3

legitimate reasons for any change in her travel behavior since early 2020, including (1) the pendency of the global COVID-19 pandemic beginning in early 2020 that restricted international travel for years, (2) Terekhova's divorce from Derkach in February 2020, and (3) the outbreak of the Russia-Ukraine war in February 2022.

*Second*, with respect to custody, the District Court determined that Terekhova is not confined in another jurisdiction based solely on the government's contention that "there is no suggestion that [Terekhova] is in custody somewhere." (SPA-13.)  This determination flies in the face of this Court's decision in *United States v. Technodyne LLC*, in which this Court squarely held that "where the government moves for disentitlement of a claimant," as here, the government "bears the burden of establishing the factual prerequisites laid out in that statute." 753 F.3d 368, 381 (2d Cir. 2014).  Under this framework, the government cannot use the *absence* of evidence of foreign custody in order to satisfy its burden on this element; *Technodyne* requires that the government affirmatively demonstrate that Terekhova is not confined abroad.  The government made no such showing here, and the District Court misapplies this Court's binding precedent in holding otherwise.  It would confound both *Technodyne* and Congress's intent in crafting the fugitive disentitlement statute if the government is permitted to meet this (or any) element necessary to establish disentitlement merely by asserting that there is "nothing in the record" to support a finding that the element is *not* met.

*Third*, with respect to notice, the District Court determined that Terekhova had knowledge of the indictment against her because, first, the unsealing of the Derkach indictment in December 2022 generated substantial media coverage. Here the District Court ignored that the initial indictment named only Derkach and not Terekhova, and that by December 2022 Derkach and Terekhova had been divorced for nearly three years. To the extent the District Court relied on the government's suggestion that "the divorce was a sham effected for the purpose of concealing Derkach's connection to the [Assets]" (SPA-7) to suggest that Terekhova was aware of Derkach's indictment, that suggestion is not alleged in the complaint, is without basis, and makes no sense in any event, as the divorce was completed nine months prior to Derkach's designation and three years prior to the unsealing of his indictment.

Apparently recognizing the lack of evidence of Terekhova's actual knowledge of the indictment against her, the District Court also found that Terekhova's civil counsel (and thus Terekhova herself) was aware of the indictment in light of an email exchange in which the government, referencing the "*Derkach* criminal matter," asked Terekhova's civil counsel if counsel was representing Terekhova "on the criminal case," and counsel responded, "I'm your huckleberry. Let me know how I can be of service." The District Court viewed this answer as counsel's confirmation of his representation of Terekhova in the "criminal case"

5

*against her* (and thus presumptively showing Terekhova's knowledge of the indictment naming her). But counsel's response does not actually confirm his representation of Terekhova in any criminal case — and in fact, the next day, when the government asked whether counsel was aware that Terekhova had been named as a defendant in the superseding indictment, counsel explained that he was *not* aware, which makes sense given that Terekhova had not been named as a defendant in the initial indictment against Derkach. The government thus failed to establish Terekhova's knowledge of the indictment, and the District Court erred in holding otherwise.

In light of these separately flawed determinations, the District Court's order granting the government's motion to strike — thereby disallowing Claimants from defending their ownership of the property at issue — was an abuse of discretion. That is particularly the case where, having (incorrectly) found that the government established the factual prerequisites necessary for fugitive disentitlement, the District Court failed to undertake the required discretionary analysis to determine whether the severe remedy of disentitlement was appropriate here.

Compounding this reversible error is the District Court's additional violation of Claimants' due process rights in light of its refusal (at the government's request) to consider Claimants' motion to dismiss the civil forfeiture complaint, which Claimants filed months *before* the government sought to strike Claimants' claims.

6

Disentitlement is an extraordinary remedy that "heavily burdens [a defendant's] exercise of the due process right to defend herself in court," *United States v. Bescond*, 24 F.4th 759, 767 (2d Cir. 2021), and Claimants should have been permitted to test the sufficiency of the factual allegations against them before being forced to oppose the government's motion to strike, particularly given that civil forfeiture complaints must meet not only the general pleading standard set out in Rule 8 of the Federal Rules of Civil Procedure, but also the more exacting standard set out in Rule G(2)(f) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions. Here, however, the government prevented Claimants from challenging the sufficiency of the complaint by pursuing a fugitive disentitlement motion, convincing the District Court to hear that motion before any motion to dismiss, and then prevailing on that motion despite failing to carry the evidentiary burden. The result is that legitimate property owners have been unfairly disentitled from their claims to property without due process, and in violation of this Court's precedent.

This Court should reverse the District Court's order granting the government's motion to strike, or at a minimum vacate that order and remand so that the District Court may conduct the necessary discretionary analysis and properly consider Claimants' motion to dismiss.

7

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over this civil forfeiture action under 28 U.S.C. §§ 1345 and 1355.  (A-10.)  On December 11, 2023, the District Court granted the government's motion to strike Claimants' claims with a "written opinion to follow."  (A-7 (minute entry dated 12/11/2023).)  Claimants timely filed a notice of appeal of the District Court's December 11 order on February 9, 2024.  (A-403.)  On March 25, 2024, the District Court issued its Opinion on the motion to strike.  (SPA-1.)  Claimants timely filed an amended notice of appeal of the District Court's opinion on April 29, 2024.  (A-405.)  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.     Whether the District Court abused its discretion by granting the government's motion to strike, and thereby disentitling Claimants from asserting their claims over the Assets under the fugitive disentitlement statute, 28 U.S.C. § 2466, based on clearly erroneous factual findings and a misapplication of governing law.

2.     Whether the District Court abused its discretion by granting the government's motion to strike, and thereby disentitling Claimants from asserting their claims over the Assets under the fugitive disentitlement statute, 28 U.S.C. § 2466, without conducting the required discretionary analysis.

8

3.    Whether the District Court violated Claimants' due process rights by deciding the government's motion to strike without having first decided Claimants' prior-filed motion to dismiss.

## STATEMENT OF THE CASE

Claimants 7D and 73DT appeal from the December 11, 2023 order, together with the March 25, 2024 Opinion explaining the order, entered by the Honorable Dora L. Irizarry of the United States District Court for the Eastern District of New York.  (A-7 (minute entry dated 12/11/2023); SPA-1.)

On December 7, 2022, the government filed its complaint in this civil forfeiture action (the "Complaint") against two California condominium properties and the contents of two bank accounts (together, the "Assets"),[3] seeking forfeiture of the Assets.  (A-9.)  The Complaint alleges that the Assets are subject to forfeiture (1) under 18 U.S.C. § 981(a)(1)(A), as property involved in a money laundering transaction in violation of 18 U.S.C. §§ 1956 or 1957; (2) under 18 U.S.C. § 981(a)(1)(C), as property derived from proceeds traceable to (i) bank fraud in violation of 18 U.S.C. § 1344 or (ii) a violation of the International

---

[3] The two condominium properties are units 103 and 203 at 432 North Oakhurst Drive, Beverly Hills, California 90210 (together, the "Real Estate Properties"). The contents of the bank accounts are the funds held in the name of 7D that are on deposit with, or traceable to: (1) Stifel Nicolaus & Co., account number ending in 9142 (the "Stifel Account"); and (2) Citizens Business Bank, account number ending in 7135 (the "Citizens Account").  (A-11.)

9

Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705(a); and/or

(3) under 31 U.S.C. § 5335(e), as property involved in the concealment of the

source of assets in a monetary transaction, in violation of 31 U.S.C. § 5335.

(A-10.)

On December 9, 2022, the government notified the District Court that the

civil forfeiture action arose out of the conduct charged in the criminal case *United*

*States v. Andrii Derkach*, No. 22-CR-432 (DLI) (E.D.N.Y.).  (A-35.)  The

indictment in that case charged Derkach, the sole defendant, with seven counts

related to election interference, sanctions evasion, bank fraud, and money

laundering.  *Derkach*, No. 22-CR-432, at Dkt. 3.

On December 15, 2022, the government filed a letter requesting the issuance

of warrants for the arrest of the Stifel Account and the Citizens Account.  (A-37.)

The District Court issued the warrants on January 4, 2023.  (A-45.)  On January 6,

2023, the government filed notices of *lis pendens* as to the Real Estate Properties.

(A-48, 52.)

On January 18, 2023, Claimants appeared in the action and filed a motion

seeking a 30-day extension of their time to file claims with respect to the Assets.

10

(A-56, 57.)[4]  The District Court granted the extension on January 19, 2023.

(A-4 (minute entry dated 01/19/2023).)

On January 23, 2023, a superseding indictment (the "Indictment") was filed naming as a defendant Terekhova, Derkach's ex-wife, but otherwise containing the same substantive factual allegations.  *United States v. Derkach*, No. 22-CR-432 (DLI) (E.D.N.Y.), at Dkt. 9.

On January 26, 2023, the government filed certificates of service stating that it caused the Complaint, the notice of the commencement of the forfeiture action, and related case documents to be served on Claimants.  (A-59.)  On February 7, 2023, the government filed a confirmation that it executed the seizure warrant as to the Stifel Account and had seized $383,073.83 from that account.  (A-72.)

On February 21, 2023, Claimants filed claims asserting an interest in each of the Assets.  (A-76, 79.)

On March 14, 2023, Claimants filed a motion to dismiss the Complaint for failure to state a claim (A-86, 88), along with declarations by Steven R. Welk (the "Welk Declaration") (A-115) and Yuliya Luy (the "Luy Declaration") (A-121).

---

[4] On January 20, 2023, Yosef Manela, initially a claimant in the underlying civil action, also filed a motion for an extension of time to file a claim.  (A-58.)  The District Court granted the extension on January 24, 2023.  (A-4 (minute entry dated 01/24/2023).)  Manela later filed a claim over the Assets (A-82), but withdrew his claim with prejudice and withdrew as a participant in the case (A-150).  Manela is not an appellant in this appeal.

11

On March 20, 2023, the government filed a letter requesting a pre-motion conference in anticipation of filing a motion to strike the claims to the Assets on the basis of fugitive disentitlement. (A-133.) Alongside that request, the government further requested that a decision on Claimants' pending motion to dismiss be held in abeyance (or dismissed without prejudice) until after a decision on the motion to strike, and that the government's deadline to respond to the motion be stayed pending a decision on the request. The District Court directed Claimants to respond to the government's letter and held briefing on the motion to dismiss in abeyance. (A-5 (minute entry dated 03/21/2023).) Claimants filed a letter in opposition to the government's request on March 27, 2023. (A-136.)

The District Court held a conference on June 5, 2023, and heard argument on the government's request to file a motion to strike and to hold the motion to dismiss in abeyance. (A-6 (minute entry dated 06/05/2023); A-153.) At the conference, the District Court terminated Claimants' motion to dismiss without prejudice, granted the government's request to file a motion to strike, and scheduled oral argument on the motion for October 30, 2023. (A-156–57, 163.)

On July 17, 2023, the government filed its motion to strike Claimants' claims (A-169, 171), together with supporting material, including an affidavit by FBI Special Agent Kenneth Wolf (the "Wolf Affidavit") (A-192) and declarations by Assistant United States Attorneys Madeline O'Connor (A-266) and Artie

12

McConnell (A-345).  Claimants filed their response in opposition on August 28, 2023 (A-348), together with supporting material, including a declaration by Ryan P. Poscablo (A-376).  The government filed its reply on September 25, 2023. (A-387.)

On October 27, 2023, the District Court adjourned without explanation the oral argument it had scheduled for October 30 and, on November 3, rescheduled argument for November 30, 2023.  (A-6–7 (minute entries dated 10/27/2023 and 11/03/2023).)  On November 15, 2023, the government moved to adjourn the November 30 argument.  (A-400.)  The District Court granted the motion and rescheduled oral argument for December 12, 2023.  (A-7 (minute entry dated 11/16/2023).)

On December 11, 2023 — one day before the scheduled argument — the District Court canceled the December 12 conference without explanation and issued an order granting the government's motion to strike, stating that a written opinion would follow.  (A-7 (minute entry dated 12/11/2023).)

Claimants timely filed a notice of appeal on February 9, 2024.  (A-403.)

On March 25, 2024, the District Court issued the Opinion explaining its December 12, 2023 order granting the motion to strike.  (SPA-1.)

Claimants timely filed an amended notice of appeal on April 29, 2024, which this Court docketed together with the original appeal.  (A-405.)

13

## STATEMENT OF FACTS

### A. The Claimant Entities

Claimants are California corporate entities 7D Business Bureau, Inc. ("7D") and 73DT Business Enterprises, LLC ("73DT"). (A-118, 120.) The business purpose of both entities is real estate investment. (A-273, 307.)

Both entities were created by a U.S.-based financial services professional, Yosef Manela, on July 25, 2013. (A-118, 120.) 7D is the sole member of 73DT. (A-272, 306.) Manela was the chief executive officer of 73DT (A-22), and in that capacity "managed and engaged in transactions on behalf of Claimant[s]" (A-274, 308). The "[m]anagement and operations decisions of Claimant[s] relating to the [Assets] were made by Terekhova[] [and] Manela." (A-278, 312.) Manela remained in his role until February 2023, when Zaourbek Sagaev became the sole officer and director of 7D and 73DT. (A-272, 306, 341, 343.)

Oksana Terekhova has, at all times, been the sole shareholder of 7D. (A-272, 274, 281, 286, 306, 308, 315, 320.) Claimants have no relationship to Derkach, and Derkach has no ownership interest in Claimants. (A-272, 281, 306, 315.)

Terekhova was married to Andrii Derkach at the time 7D and 73DT were created, but they divorced in February 2020. (A-122, 124, 127.) The Ukrainian divorce court decision dated February 25, 2020 states that "[t]he marriage

14

relationship is terminated due to lack of mutual understanding"; that "[t]he parties do not live together, [and] do not manage the household"; and that "[t]he family has actually disintegrated and further cohabitation and preservation of the family is impossible." (A-127.)

### B. The Indictment

On September 26, 2022, the government filed a sealed indictment against Derkach in the Eastern District of New York. *United States v. Andrii Derkach*, No. 22-CR-432 (DLI) (E.D.N.Y.), at Dkt. 3. The indictment was unsealed on December 7, 2022. *Id.* at Dkt. 7. On January 23, 2023, the government superseded the September 26 indictment, filing the Indictment, which named as a defendant Terekhova, Derkach's ex-wife, but otherwise contained the same substantive factual allegations. *Id.* at Dkt. 9.

The Indictment alleges that Derkach — a Ukrainian national who has held various roles in the Ukrainian government, including serving as a member of the Ukrainian Parliament from 1998 through November 2006 and from November 2007 onward (Indictment, ¶¶ 1–2) — purchased, together with his then-wife Terekhova, two condominium units in Beverly Hills, California, in December 2013, through 7D and 73DT, "while concealing [Derkach's] interest in the transactions from U.S. financial institutions." (Indictment, ¶¶ 14, 18, 24.) According to the Indictment, Derkach and Terekhova misrepresented or concealed

15

Derkach's ownership or beneficial interest in 7D, along with his status as a "politically exposed person" in light of his role in the Ukrainian parliament, when Manela opened and transferred money to brokerage accounts in connection with the purchase and maintenance of the properties. (Indictment, ¶¶ 19–27.)

In September 2020, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") imposed sanctions against Derkach for his supposed "efforts" on behalf of the Russian Federation "to influence the 2020 U.S. presidential election." (Indictment, ¶¶ 3, 5, 29.) According to the Indictment, since his sanctions designation, Derkach has sought to make payments to maintain the Real Estate Properties while concealing his identity. (Indictment, ¶¶ 30–33.)

On the basis of these allegations, the Indictment charges Derkach with conspiracy to violate IEEPA by causing U.S. financial institutions to provide services for Derkach's benefit after his sanctions designation; conspiracy to commit bank fraud; and money laundering offenses. (Indictment, ¶¶ 35–43.) The Indictment also contains criminal forfeiture allegations. (Indictment, ¶¶ 44–48.)

### C. The Forfeiture Complaint

On December 7, 2022, the day that the initial indictment against Derkach was unsealed and a month before Terekhova was named in the superseding Indictment, the government filed the Complaint in this action in the Eastern District of New York seeking forfeiture of the Assets — the Real Estate Properties,

the Stifel Account, and the Citizens Account. (A-9–11, 30–31.) The Complaint —

whose factual allegations are substantively the same as those contained in the

Indictment — alleges that Derkach and Terekhova purchased the Real Estate

Properties in 2013 using 7D and 73DT; that they did so while "concealing

Derkach's interest in the transactions" and "misrepresent[ing] details about

Derkach's identity" and status as a politically exposed person; that Derkach and

Terekhova met and communicated with Manela, whom they had used to purchase

the Real Estate Properties, on multiple occasions between 2013 and 2019; that

Derkach and Terekhova caused Manela to open bank accounts — the Stifel

Account and the Citizens Account — whose purpose was to make payments to

maintain the Real Estate Properties, but concealed Derkach's interest in those

accounts from Manela; that Derkach and Terekhova monitored how money in the

Stifel Account and Citizens Account was spent; and that Derkach and Terekhova

caused Manela to continue to make payments in connection with the Real Estate

Properties after Derkach was designated as a sanctioned individual by OFAC in

September 2020. (A-20–30.)

### D. The Claims and the Motion to Dismiss

On February 21, 2023, Claimants timely filed claims asserting their

respective interests in the Assets. (A-76, 79.) Thereafter, on March 14, 2023,

Claimants moved to dismiss the Complaint for failure to state a claim. (A-86, 88.)

17

Claimants argued that the Complaint failed to state valid forfeiture claims based on money laundering, proceeds, or any other theory, because the government had failed to satisfy Rule G(2)(f)'s heightened pleading standard applicable to civil judicial forfeiture complaints, which requires the government to allege sufficiently detailed facts to support a reasonable belief that it would be able to meet its burden of proof at trial.  (A-104–13.)

Alongside the motion to dismiss, Claimants submitted (1) the Welk Declaration, which included copies of 7D and 73DT's California articles of incorporation (A-115); and (2) the Luy Declaration, which included Russian- and English-language copies of the February 2020 decision finalizing the divorce of Derkach and Terekhova nine months prior to Derkach's sanctions designation in September 2020 (A-121).

### E. The Government's Motion to Strike

The government did not file an opposition to the motion to dismiss.  Instead, on March 20, 2023, the government filed a letter requesting a pre-motion conference to address (1) the government's proposed motion to strike Claimants' claims over the Assets on the basis of fugitive disentitlement under 28 U.S.C. § 2466, and (2) the government's related request to hold the motion to dismiss in abeyance (or to deny the motion without prejudice) until after a ruling on its proposed motion to strike.  (A-133.)  In support of the proposed motion to strike,

the government asserted that Terekhova is "the sole owner of record of 7D, which, in turn, is the sole owner of record of 73DT," and that Terekhova was "aware of the criminal charges against her, but has not returned to the United States to face those criminal charges." (A-134.)

On March 27, 2023, Claimants filed a letter in opposition to the government's proposed motion. (A-136.) Claimants explained that "fugitive disentitlement is not a threshold issue that must be determined before a motion to dismiss," and that Claimants' pending motion to dismiss testing the legal sufficiency of the Complaint should be addressed first, before any motion to strike. (A-136.)

The District Court granted the government's request for a pre-motion conference, and set the conference for June 5, 2023. (A-5 (minute entry dated 04/13/2023).) At the June 5 conference, the District Court stated that although fugitive disentitlement "isn't necessarily a mandatory threshold matter," it viewed fugitive disentitlement as similar to a standing inquiry, which is a threshold question. (A-155–57.) In response, Claimants explained (1) that the standing inquiry is jurisdictional, while the disentitlement inquiry is not (*i.e.*, it is prudential), and therefore the District Court was not required to address disentitlement at the outset of the case; (2) that good reason existed to address the motion to dismiss testing the legal sufficiency of the allegations in the Complaint

(which was lacking) before any disentitlement motion, including because a disentitlement motion allows the government (but not Claimants) to conduct discovery that can then be used in a related criminal case; and (3) that the government did not seem to know that Terekhova and Derkach "were divorced nine months *before* he was designated" as a sanctioned individual, which is crucial because Derkach's designation, and alleged events that took place after it, are at "the heart" of the Complaint. (A-160–66.)

Ultimately, the District Court determined that hearing the government's proposed motion to strike based on fugitive disentitlement before Claimants' pending motion to dismiss was "the most prudent way to proceed from a resources perspective." (A-163.) As a result, the District Court terminated the motion to dismiss without prejudice and set a briefing schedule on the motion to strike. (A-6 (minute entries dated 06/05/2023).)

The government filed its motion to strike on July 17, 2023. (A-169.) The government argued that Claimants' claims should be stricken because Terekhova and Derkach were aware of the criminal charges against them and deliberately avoided returning to the United States to face those charges. (A-171.) The government attached as exhibits, among other things, the Wolf Affidavit (A-192), which (1) acknowledges that "Terekhova is the sole shareholder of record of 7D" (A-196); (2) asserts that Terekhova has not traveled to the United States since

20

January 2020 (A-199); and (3) asserts that Derkach and Terekhova's daughter stated that Derkach and Terekhova's "divorce was a sham" (A-194).

Claimants filed an opposition to the motion to strike on August 28, 2023, explaining (1) that Terekhova's lack of recent travel to the United States is unrelated to any pending criminal charges, of which the government had not demonstrated Terekhova's knowledge, as it is required to do; (2) that Terekhova's lack of travel to the United States since January 2020 cannot be evidence of her avoiding an indictment not filed until three years *later*; and (3) that the government improperly used "hearsay within hearsay" to attempt to substantiate its baseless suggestion that Terekhova was involved in wrongdoing and that her divorce from Derkach was somehow a "sham." (A-348.)

On September 25, 2023, the government filed its reply (A-387), asserting that Derkach and Terekhova were aware of the December 2022 and January 2023 criminal charges against them because they had "prepared for and were expecting the sanctions and related criminal and civil litigation" when they ceased travel to the United States in early 2020 (A-392–93).

### F. The District Court's December 11, 2023 Order and March 25, 2024 Opinion

At the government's request, the District Court scheduled oral argument for the motion to strike for December 12, 2023. (A-7 (minute entry dated 11/16/2023).) On December 11, 2023, however, one day before argument was

21

scheduled, the District Court canceled the conference and entered an order granting the government's motion to strike, stating that "a written opinion will follow." (A-7 (minute entry dated 12/11/2023).)

The District Court issued its Opinion on March 25, 2024. (SPA-1.) As an initial matter, although it was undisputed that "Terekhova is the ultimate beneficial owner of the [Assets]" claimed by Claimants, the District Court determined that Derkach also "had *and continues to have* an interest in" the Assets, and thus that Derkach and Terekhova had "joint control over" the Assets for purposes of the fugitive disentitlement inquiry. (SPA-6–7 (emphasis added).) In support of this determination, the District Court cited (1) the allegations in the Complaint that "Derkach met with Manela four times" between 2013 and 2017, during which Derkach allegedly "conveyed the impression that he had decision making authority" (SPA-7 (citing A-29)); alleged undated "[s]tatements by Derkach and Terekhova's daughter," which "indicated that Derkach was an owner of the property, but 'her living situation and finances were structured to avoid implicating Derkach or sanctions'" (SPA-7 (citing A-29)); and (3) the government's argument — unsupported by credible (much less admissible) evidence — that Derkach and Terekhova's "divorce was a sham effected for the purpose of concealing Derkach's connection to the [Assets]" (SPA-7 (ultimately citing A-195)). The District Court further determined that, even if "Derkach has no [current] interest in the [Assets],"

22

the "requirements for fugitive disentitlement are still met as to Terekhova."
(SPA-7.)

With respect to fugitive disentitlement, the District Court explained that
courts may disallow a claim over property subject to civil forfeiture pursuant to 28
U.S.C. § 2466 where each of five elements are met:  "(1) a warrant or similar
process has been issued in a criminal case for the claimant's apprehension; (2) the
claimant has notice or knowledge of the warrant; (3) the criminal case is related to
the forfeiture action; (4) the claimant is not confined or in custody in another
jurisdiction; and (5) the claimant is deliberately avoiding prosecution in the United
States."  (SPA-5–6 (citing *Collazos v. United States*, 368 F.3d 190, 198 (2d Cir.
2004)).)  The District Court explained that there is no dispute that elements one
and three were satisfied (as is generally the case in such matters), because "a court
has issued warrants for Derkach's and Terekhova's apprehension in a criminal case
and that the criminal case is related to the instant forfeiture action."  (SPA-7.)

With respect to element two (notice of the warrant), the District Court
determined "both Derkach and Terekhova have notice and knowledge of their
indictment in the criminal case," because, first, the unsealing of Derkach's
indictment generated substantial media coverage.  (SPA-8–9.)  The District Court
acknowledged, however, that media coverage alone is "insufficient to satisfy the
notice" element absent "evidence that the media reached the alleged fugitive

23

defendant wherever he or she was," and that Terekhova's indictment "generated significantly less interest in the media" than did the unsealing of Derkach's indictment. (SPA-8.)

The District Court further determined that Derkach and Terekhova had notice of the indictments because counsel for Claimants and Terekhova in this action purportedly "confirmed his representation of Terekhova in the criminal case," and therefore that Terekhova must also be aware of the Indictment. (SPA-9.) The District Court further noted that counsel for Claimants had filed paperwork for Zaourbek Sagaev, who became the officer and director of Claimants in February 2023, after Manela's resignation. (SPA-9–10.) The District Court stated that "[w]hile there is nothing in the record explicitly indicating who directed [counsel] to place Sagaev in charge of Claimants, it strains credulity that he would not have informed Terekhova at least of this change and the reasons for it, namely, her indictment and [Manela's] resignation." (SPA-10.) The District Court wrote — notwithstanding that it separately acknowledged that "the Government 'bears the burden of establishing the factual prerequisites'" for fugitive disentitlement (SPA-6) — that, "[n]otably absent from Claimants' arguments is any assertion that Derkach or Terekhova do not actually know that they have been indicted." (SPA-12.)

With respect to element four (foreign custody), the District Court determined — again, notwithstanding that it acknowledged "[o]f course the burden never falls on Claimants to disprove any of requisite elements of fugitive disentitlement" — that "nothing in the record here indicates that either Derkach or Terekhova is in detention anywhere."  (SPA-13.)

Finally, with respect to element five (deliberate avoidance of prosecution), the District Court determined that Derkach's and Terekhova's "failure to return" to the United States "appears to be deliberate in light of their past pattern of behavior and actions during the civil forfeiture proceedings."  (SPA-14.)  According to the District Court, "between the years of 2013 and 2020, Derkach and Terekhova were frequent visitors to the United States," including "purchas[ing] properties where members of their family resided and where Derkach and Terekhova indicated they intended to reside themselves," but that "following the issuance of sanctions" against Derkach in September 2020, their travel behavior changed, and "since the issuance of the criminal indictments" in December 2022 and January 2023, "Derkach and Terekhova have not returned to contest or answer the criminal charges."  (SPA-14 (citing A-28, 197–98).)

Having determined that each of the elements necessary for fugitive disentitlement was met, the District Court granted the government's motion to strike.  (SPA-15.)  Notwithstanding that the District Court separately

acknowledged that, "even when [the fugitive disentitlement] requirements are satisfied [Section] 2466 'does not mandate disentitlement'" (SPA-6 (quoting *Collazos*, 368 F.3d at 198)), the District Court did not consider whether to exercise its discretion not to order disentitlement on the current record.

## SUMMARY OF ARGUMENT

The District Court abused its discretion in granting the government's motion to strike — and thus disallowing Claimants from asserting their claims on the basis of fugitive disentitlement — because each of the four determinations upon which the District Court rested its decision was based on clearly erroneous factual findings and a misapplication of this Court's governing law.

*First*, the District Court's conclusion that Derkach (and not only Terekhova) has a current interest in the Assets — and thus that Claimants could be disentitled on the basis of a finding that either Derkach or Terekhova was a fugitive under Section 2466 — was unsupported by preponderant evidence.

*Second*, the District Court's conclusion that Terekhova is deliberately avoiding prosecution based on a change in travel behavior is flawed because Terekhova's purported change in travel behavior cannot be attributed to Derkach's sanctioning, the unsealing of Derkach's indictment, or the filing of the indictment against Terekhova.

26

*Third*, the District Court's conclusion that Terekhova is not in foreign custody is flawed because it is based only on the absence of evidence, and not on any affirmative evidence, in contravention of this Court's decision in *Technodyne*, which held that the government "bears the burden of establishing the factual prerequisites" of fugitive disentitlement. 753 F.3d at 381.

*Fourth*, the District Court's conclusion that Terekhova has knowledge of the indictment against her is flawed because (1) absent evidence that media coverage of the unsealing of Derkach's indictment reached Terekhova, such media coverage cannot be used to show Terekhova's knowledge, particularly where that indictment did not name Terekhova and where, by that point, Derkach and Terekhova had been divorced for nearly three years; (2) the government's suggestion that the divorce was a "sham" is baseless; and (3) email correspondence between the government and counsel for Claimants, read in full, does not reasonably suggest that counsel represented Terekhova in the criminal case or that Terekhova was aware of the indictment against her.

Each of the foregoing errors, standing alone, is sufficient to overturn the District Court's order. *See* Point I, *infra*. Compounding that abuse of discretion, however, is that the District Court, having (wrongly) determined that the factual prerequisites for fugitive disentitlement were met, failed to undertake the required

discretionary analysis to determine whether Claimants should be disentitled.  *See* Point II, *infra*.

Finally, the District Court failed entirely to consider Claimants' first-filed motion to dismiss, opting instead to consider only the government's motion to strike.  As a matter of due process, the District Court should have tested the legal sufficiency of the Complaint — whose factual allegations lacked the particularity required in civil forfeiture actions — before ordering the extraordinary remedy of disentitlement.  *See* Point III, *infra*.

## STANDARD OF REVIEW

Disentitlement under 28 U.S.C. § 2466 is legally permissible only where the government establishes that each of five elements, or "prerequisites," is met: "(1) a warrant or similar process must have been issued in a criminal case for the claimant's apprehension; (2) the claimant must have had notice or knowledge of the warrant; (3) the criminal case must be related to the forfeiture action; (4) the claimant must not be confined or otherwise held in custody in another jurisdiction; and (5) the claimant must have deliberately avoided prosecution by (A) purposefully leaving the United States, (B) declining to enter or reenter the United States, or (C) otherwise evading the jurisdiction of a court in the United States in which a criminal case is pending against the claimant." *Technodyne*, 753 F.3d at 378 (quoting *Collazos*, 368 F.3d at 198).  With respect to the central fifth

element, the government must "prove that the [claimant] remained outside of the United States with the *specific intent* to avoid criminal prosecution." *Id.* at 383 (emphasis added).

In the absence of an express statement in the governing statute of the quantum of proof required, "[p]roof by a preponderance of the evidence is the standard usually used in pretrial proceedings." *United States v. Chimurenga*, 760 F.2d 400, 406 (2d Cir. 1985); *see Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 778 (7th Cir. 2016) (collecting Supreme Court case law holding that, in civil actions, "unless the governing statute . . . specifies a higher burden . . . proof by a preponderance of the evidence will suffice"); 18 U.S.C. 983(c)(1) ("the burden of proof [in a civil forfeiture proceeding] is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture"); 21 U.S.C. § 853(d) (burden of proof in criminal forfeiture proceeding is on government to "establish[] by a preponderance of the evidence" that property is subject to forfeiture). In this regard, the government has acknowledged elsewhere that "the burden is on the United States to prove the applicability of the [fugitive disentitlement] doctrine and the existence of the five prerequisites under the fugitive disentitlement statute *by a preponderance of the evidence*." *United States v. $525,695.24 Seized from JP Morgan Chase Bank Investment Acct #74068415*,

29

No. 13-CV-1455 (DCN) (N.D. Ohio), at Dkt. 85 at 15 (government motion to strike) (citing, *inter alia*, *Technodyne*, 753 F.3d at 379) (emphasis added).

Where the government has established each of the five disentitlement elements by a preponderance of the evidence, the district court "*may* disallow" a claimant from asserting a claim, but need not do so. *Technodyne*, 753 F.3d at 378, 383 (emphasis in original).

Because district courts have discretion in deciding "whether to order [fugitive] disentitlement [under 28 U.S.C. § 2466] in a particular case," *Collazos*, 368 F.3d at 198, this Court reviews a district court's "decision to order disentitlement . . . for abuse of discretion," *Technodyne*, 753 F.3d at 378. An abuse of discretion may occur where there is "an erroneous view of the law, a clearly erroneous assessment of the facts, or a decision that cannot be located within the range of permissible decisions." *Id.* (internal quotation marks omitted). "A [factual] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Otal Invs. Ltd. v. M/V CLARY*, 673 F.3d 108, 113 (2d Cir. 2012) (citation omitted).

# ARGUMENT

## POINT I

**The District Court Abused Its Discretion By Granting the Government's Motion To Strike On Clearly Erroneous Findings of Fact and a Misapplication of Governing Law**

### A. The District Court's Conclusion that Derkach Has A Current Interest in the Assets Is Based on a Clearly Erroneous View of the Evidence

Before turning to the fugitive disentitlement inquiry, the District Court first determined that Terekhova and Derkach both had a current ownership interest in Claimants and the Assets (SPA-6) — and thus that Claimants' claims over the Assets could be disallowed should the District Court conclude that *either* Terekhova or Derkach was a "fugitive" within the meaning of 28 U.S.C. § 2466. This determination was based on a clearly erroneous assessment of the evidence, and to the extent the District Court granted the government's motion to strike Claimants' claims on the basis of Derkach's purported "interest" in Claimants or the Assets, the District Court abused its discretion.

It is undisputed that Terekhova, while not the titled owner of the Assets, has at all times been the sole shareholder of 7D (which itself is the sole member of 73DT), and therefore has a current beneficial (*i.e.*, indirect) interest in the Assets. (SPA-6; A-272, 274, 281, 286, 306.) But the government failed entirely to establish that *Derkach* has any current interest in the Assets. The District Court's

31

conclusion otherwise was based solely on the allegations in the Complaint (1) that

"Derkach met with Manela four times" between 2013 and 2017, during which he

purportedly "conveyed the impression that he had decision making authority" over

the Assets, and (2) that at some unspecified time, Derkach and Terekhova's

daughter made unspecified "statements" that somehow "indicated that Derkach

was an owner of the property." (SPA-7 (citing A-29).) These bare allegations,

however, are insufficient to demonstrate by a preponderance (or any standard) that

Derkach had an ownership interest in the Assets at any time after 2017, let alone at

the time of the filing of the Complaint in December 2022, which was nearly three

years *after* Derkach and Terekhova completed their divorce in February 2020.

To the extent the District Court endorsed the government's suggestion that

Terekhova and Derkach's "divorce was a sham effected for the purpose of

concealing Derkach's connection to the [Assets]" (SPA-7), that suggestion is

without credible (let alone sufficient) record basis. The sole support for the

District Court's finding is a single sentence in the Wolf Affidavit stating that,

"[a]lthough Derkach and Terekhova appear to have divorced in or about February

2020, evidence obtained through the investigation revealed that Derkach and

Terekhova's younger daughter stated, in sum and substance, to a witness with

whom she confided, that the divorce was a sham for the purposes of protecting the

family's assets." (A-195.) This conclusory statement — which describes an out-

of-court statement made by a third party, which the government cites for the purpose of showing the truth of the matter asserted and therefore is hearsay — does not describe what the "evidence obtained" actually is, what the daughter actually stated, to whom she allegedly made the statement, or whether the government's "investigation" into this issue revealed any other evidence going to Derkach and Terekhova's divorce (or their recent living or economic arrangements). Because the government does not tell us what the daughter purportedly actually stated, neither Claimants nor the District Court could possibly have assessed whether the government's interpretation of what the daughter stated "in sum and substance" was correct or reliable.

The government's bare citation to paraphrased oral hearsay is not a credible basis upon which to conclude that the divorce was a "sham," particularly given that the only reliable evidence on the divorce before the District Court — the divorce order issued by a Ukrainian court — states that "[t]he marriage relationship is terminated due to lack of mutual understanding"; that "[t]he parties do not live together, [and] do not manage the household"; and that "[t]he family has actually disintegrated and further cohabitation and preservation of the family is impossible." (A-127.) Neither the government nor the District Court address the divorce order at all, let alone suggest any credible reason to doubt what it says. The idea that the divorce was a "sham" intended to protect assets makes no sense

in any event, as the divorce was completed *nine months* prior to Derkach's

sanctioning and *three years* prior to the filing of this Complaint and the unsealing

of the Derkach indictment, and the government has put forth no evidence

suggesting that Derkach and Terekhova were even aware of the possibility of

Derkach being sanctioned or indicted as of February 2020.

For these reasons, the evidence was wholly insufficient to support the

conclusion that Derkach has any current (or relevant prior) interest in the Assets.

*Cf. Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 336–41 (2d Cir. 1999)

(holding that the district court relied on a clearly erroneous assessment of the

evidence in imposing sanctions, where "the facts in their totality belie the [district

court's] conclusion[s] and "the record cannot support [the] inference[s]" the district

court drew).  Accordingly, to the extent the District Court's ultimate determination

granting the government's motion to strike and disentitling Claimants was based on

its factual finding (by some unspecified standard) that Derkach (as opposed to

Terekhova) was a fugitive for purposes of 28 U.S.C. § 2466, that determination

was an abuse of discretion.

    **B.**    **The District Court's Conclusion that Terekhova Is Deliberately Avoiding the Jurisdiction of the United States Is Based on Clearly Erroneous Findings**

With respect to the fifth element necessary to establish disentitlement —

that "the claimant must have *deliberately avoided* prosecution," *Technodyne*, 753

34

F.3d at 378 (emphasis added) — the District Court was required to find by a preponderance, and the government was required to "prove[,] that [Terekhova] remained outside of the United States with the *specific intent* to avoid criminal prosecution." *Id.* at 383 (emphasis added).

Notwithstanding that deliberate avoidance is at the heart of the fugitive disentitlement inquiry, the District Court's analysis of this element was brief — just two substantive paragraphs — and its determination that Terekhova deliberately avoiding U.S. jurisdiction was based on a clearly erroneous assessment of the little evidence the government presented. The District Court's analysis states in full:

> Here, the pattern of behavior of Derkach and Terekhova in the years leading up to the sanctions and the indictment and the change in their behavior following the indictment strongly suggest that they are evading criminal prosecution. The record shows that, between the years of 2013 and 2020, Derkach and Terekhova were frequent visitors to the United States. Wolf Aff. at ¶ 20 [A-198]. They purchased properties where members of their family resided and where Derkach and Terekhova indicated they intended to reside themselves. *Id.*; Compl. at ¶ 64 [A-28].

> This contrasts sharply with their behavior following the issuance of sanctions. The same day that Derkach was sanctioned, their younger daughter moved out of the defendant *in rem* condominium in which she was living. *Id.* at ¶ 15 [A-197]. The record establishes that, since the issuance of the criminal indictments, Derkach and Terekhova have not returned to contest or answer the criminal charges. Their failure to return appears to be deliberate in light of their past pattern of behavior and actions during the civil forfeiture proceedings. Therefore, the Court finds that the fifth prerequisite for disentitlement has been met.

(SPA-14.)

35

Virtually every portion of the District Court's analysis is flawed.  In the first

paragraph, the District Court suggests that Terekhova had a "pattern" of "frequent"

prior travel to the United States, but the cited portion of the government's

"evidence" — the Wolf Affidavit — states only that "[i]nformation obtained by

law enforcement during the course of the investigation revealed that, between 2013

and 2020, Derkach and Terekhova came to the United States on numerous

occasions to, *inter alia*, meet with Manela and a wealth manager, to view real

estate, and [for Derkach and Terekhova's younger daughter] to reside in one of the

[Real Estate Properties]" "between around 2018 and 2020."  (A-198.)  No detail is

given beyond that single sentence.  The affidavit does not suggest how many times

Derkach and Terekhova came to the United States, when they traveled, how long

they stayed, or whether there was any change in Terekhova's travel frequency or

behavior between 2013 and 2020.  Nor does the affidavit suggest that Terekhova

ever resided in the Real Estate Properties.  The District Court therefore had no

adequate basis for, much less preponderant evidence supporting, its factual finding

that Terekhova had a "pattern" of "frequent" travel to the United States prior to

2020 (SPA-14), and this finding was therefore clearly erroneous.

Second, even if the government's proof had established a prior "pattern" of

"frequent" travel by a preponderance (which it did not), the District Court's further

determination that such prior travel "contrasts *sharply* with [Terekhova's] behavior

following the issuance of sanctions" (SPA-14 (emphasis added)) does not hold up under scrutiny either.  In support of this flawed determination, the District Court first states, "[t]he same day that Derkach was sanctioned, [Derkach and Terekhova's] *younger daughter* moved out of the [Real Estate Property] in which she was living" (SPA-14) (emphasis added), a *non sequitur* that has nothing to do with Terekhova and that does not suggest Terekhova's deliberate avoidance of prosecution, particularly given that she was not indicted until over two years after Derkach was sanctioned.  *See United States v. $40,877.59 in U.S. Currency*, 32 F.3d 1151, 1156 (7th Cir. 1994) (holding that, because the relevant law was "not [yet] in effect when [the defendant] was in the United States, it is questionable whether [the defendant] committed an act in furtherance of the alleged crime while in this country, or fled the country with the intent to avoid prosecution").

Searching for a fact relevant to deliberate avoidance, the District Court next states that "since the issuance of the criminal indictments [in December 2022 and January 2023], Derkach and Terekhova have not returned to contest or answer the criminal charges."  (SPA-14.)[5]  But the District Court failed entirely to consider that Terekhova's last travel to the United States was in January 2020, a date that is

---

[5] For the reasons stated in Point I.A, *supra*, Derkach's travel behavior is irrelevant to the fugitive disentitlement inquiry because he has no current interest in the Assets.

nine months *before* Derkach was sanctioned in September 2020 and three years *before* Derkach's indictment was unsealed in December 2022 and Terekhova was indicted in January 2023. In light of this timeline, Terekhova's purported "change" in travel behavior cannot reasonably be attributed either to Derkach's sanctioning or the unsealing of the criminal case. No evidence suggests any *post*-sanctioning or *post*-indictment "change" in Terekhova's travel behavior, much less a change that "contrasts sharply" with her prior conduct. There is no record evidence, for example, that Terekhova recently had plans to return to the United States but chose not to do so after Derkach was sanctioned in September 2020 or after Terekhova was indicted in January 2023. Cases that rely on changes in travel behavior to support disentitlement reflect significantly stronger and much more specific evidence of such changes. *See, e.g.*, *United States v. 2005 Pilatus Aircraft*, No. 12-CV-223 (NGR), 2016 WL 7230209, at *2 (S.D. Tex. Jan. 25, 2016) (pattern of travel established where government produced "immigration records show[ing] that the claimant "entered the United States from Mexico on approximately thirty occasions in 2010, fifty-two occasions in  2011, and twenty-one occasions in 2012 prior to his final departure in June").

Here, by contrast, the record evidence reflects abundant legitimate reasons for Terekhova not to have traveled to the United States since January 2020, and such reasons confirm that the District Court erred. *See United States v. Salti*, 579

F.3d 656, 665–66 (6th Cir. 2009) (holding that district court erred in granting government's fugitive disentitlement motion where district court failed to consider claimant's legitimate personal health reasons not to travel to United States). First and most obviously, the pendency of the global COVID-19 pandemic beginning in early 2020 restricted international travel, including international travel into the United States, for years. This Court itself recently acknowledged that for years from early 2020, "the world was in the midst of a pandemic" and "national emergency," which made international travel to the United States from abroad exceptionally difficult. *United States v. Won*, No. 22-2716, 2024 WL 827774, at *2 (2d Cir. Feb. 28, 2024). The extraordinary challenges of international travel to the United States during this multi-year period led this Court to affirm a district court's decision authorizing trial testimony in November 2021 by two key witnesses (who were located abroad) to proceed via video conference rather than in person, as the Confrontation Clause of the Constitution ordinarily requires. *Id.* The fact that Terekhova did not travel to the United States for several years — years that this Court itself has acknowledged were "exceptional" and during which travel to the United States from abroad was exceedingly difficult — cannot carry the weight the District Court ascribed to it.

Beyond the pandemic's effect on travel, the District Court also ignored that Terekhova divorced Derkach in February 2020 (A-127), and that Terekhova's

daughter left the United States in about August 2021 (A-198–99, 374 n.20), two fundamental changes to the family dynamic that further explain any perceived change in Terekhova's travel behavior thereafter.[6]  The District Court further ignored that Terekhova (who never resided in the United States) had no need to travel to the United States to maintain the Real Estate Properties, as Manela was responsible for maintaining the Properties.  Finally, the District Court ignored that, in February 2022, Russia invaded Ukraine, that since then the two countries have been at war, and that as a result of the war many Ukrainian nationals have been unable to travel internationally.  Had the District Court held the December 12, 2023 conference it scheduled — the conference it canceled without explanation one day prior, on December 11, in order to issue its (unexplained) minute order granting the government's motion to strike (A-6) — the District Court could have heard this and other evidence and argument that would have amply demonstrated the legitimate reasons why Terekhova had not traveled to the United States since January 2020.

---

[6] The government suggests that Terekhova's daughter's move abroad was somehow related to Derkach's sanctioning (A-186–87), but even if that (untested and unsupported) assertion is accurate, such evidence does not suggest Terekhova's deliberate avoidance of prosecution, as Terekhova was not indicted until nearly two years *after* her daughter left the United States.

In short, the evidence before the District Court — which said nothing of Terekhova's intent and at most showed that Terekhova had not come to the United States following her divorce and the outbreak of both COVID-19 and war — was wholly insufficient to support the District Court's conclusion that Terekhova was "deliberately avoiding" the jurisdiction of the United States with the "specific intent" to avoid criminal prosecution. *Technodyne*, 753 F.3d at 378, 383; *see United States v. $6,976,934.65, Plus Interest Deposited into Royal Bank of Scotland Int'l, Acct. No. 2029-56141070, Held in Name of Soulbury Ltd.* ("*Soulbury*"), 554 F.3d 123, 132 (D.C. Cir. 2009) ("mere notice or knowledge of an outstanding warrant, coupled with a refusal to enter the United States, does not satisfy the statute," under which alleged fugitive must have declined to enter or reenter the country specifically "in order to avoid prosecution"). The District Court's conclusion otherwise was based on clearly erroneous factual findings and was therefore an abuse of discretion.

This Court's recent decision in *Bescond* — which arises in the analogous context of fugitive disentitlement in a criminal case[7] — is in accord. In *Bescond*, a

_____

[7] In *Bescond*, this Court relied on, among other things, the fact that Bescond "was not in the United States while allegedly committing the charged conduct" to find that Bescond was not a fugitive. 24 F.4th at 772. *Bescond* expressly noted in this regard that although Section 2466 "extended fugitive status" in civil forfeiture cases "to persons who were not in the United States to begin with," *Bescond* "is not a forfeiture case." *Id*. Notwithstanding this language in *Bescond* regarding Section 2466, *Bescond*'s analysis of Bescond's fugitive status remains relevant

"French citizen living in France" and working at a "global bank" was indicted in the Eastern District of New York for her "participat[ion] in a scheme to manipulate" the LIBOR rate. *Bescond*, 24 F.4th at 764. The defendant, Bescond, moved to dismiss the indictment on multiple grounds, but the district court refused to consider the motion because it "concluded that Bescond was a fugitive" and thus "that disentitlement was warranted." *Id.* at 765. This Court, however, reversed. The Court noted that Bescond's "presence abroad is unrelated to the American prosecution" and not "in any part covert or suspect"; "she is a French citizen, living in France," and thus the Court cautioned against "expand[ing]" the doctrine of fugitive disentitlement — a "harsh sanction" that "heavily burdens [a defendant's] exercise of the due process right to defend herself in court" — "to reach someone such as Bescond." *Id.* at 767–68, 773.

So too here: The government's evidence in the District Court failed entirely to establish by any standard, much less by a preponderance, that Terekhova is deliberately avoiding prosecution by remaining abroad. To the contrary, just as in *Bescond*, Terekhova's "presence abroad is unrelated to the American prosecution,"

---

here to the extent *Bescond* also addresses whether Bescond had "refus[ed] to return to the United States to avoid prosecution" — that is, whether Bescond was a "constructive-flight fugitive," *id.* — which is effectively the same question as the question under Section 2466 of whether a defendant "remained outside of the United States with the specific intent to avoid criminal prosecution." *Technodyne*, 753 F.3d at 378.

*id.*, as she stopped coming here (which she was not shown to have ever done with any particular frequency to begin with) due to a combination of her divorce, the outbreak of COVID-19, and war, the latter two of which severely restricted travel during the period the District Court considered.

Because the government's spare evidence does not support the District Court's conclusion by a preponderance that Terekhova was "deliberately avoiding" U.S. jurisdiction with the "specific intent" to avoid criminal prosecution, the District Court should not have applied the "harsh" doctrine of fugitive disentitlement to Claimants. This error alone requires reversal of the District Court's order.

### C. The District Court's Conclusion that Terekhova Is Not Confined Elsewhere Is Not Supported and Cannot Be Squared with Governing Law

With respect to another element necessary to establish disentitlement — "that the claimant must not be confined or otherwise held in custody in another jurisdiction," *Technodyne*, 753 F.3d at 378 — the District Court determined that "there is no suggestion that [Terekhova] is in custody somewhere." (SPA-13.) This conclusion was supported by no affirmative evidence, and was based solely on the Wolf Affidavit's bare assertion that it is "unaware of any facts to suggest that Terekhova or Derkach are confined." (A-198.)

The District Court's determination flies in the face of this Court's decision in *Technodyne*, in which this Court held that the government "bears the burden of establishing the factual prerequisites" for fugitive disentitlement. 753 F.3d at 381. Under this Court's allocation of the burden of proof, there is no basis for the District Court to hold that the government met its evidentiary burden on foreign custody through the *absence* of evidence. To the contrary, *Technodyne* requires that the government affirmatively demonstrate that Terekhova is not confined abroad. The government made no such showing here, and the government's statement that it is "unaware of any facts to suggest" foreign custody — does not suggest that the government conducted even a cursory investigation into this issue. The District Court thus flouts *Technodyne* in holding that the government's absence of evidence was sufficient to establish this element.

Nor does the District Court's citation of this Court's pre-*Technodyne* decision in *Collazos* support its determination on this element. According to the District Court, because *Collazos* affirmed a district court's disentitlement order where "nothing in the record indicated that the [c]laimant was ever confined," the District Court could find that the custody element was satisfied on a similar evidentiary record. (SPA-13 (quoting *Collazos*, 368 F.3d at 201) (original alterations omitted).) Critically, however, the District Court ignored that *Collazos* preceded by a decade this Court's holding in *Technodyne*, in which this Court

44

addressed for the first time the allocation of the burden of proof in the fugitive disentitlement inquiry. This Court — noting that "we [do not] see any indication that Congress intended to place on a claimant the burden of proof with respect to the factual prerequisites set out in the fugitive disentitlement statute," and that "[t]here can be no serious suggestion that a claimant should have the burden of proving the negatives of such matters" — held that "where the government moves for disentitlement of a claimant, it bears the burden of establishing the factual prerequisites laid out in that statute." *Technodyne*, 753 F.3d at 380–81. Regardless of whether the *Collazos* approach to the foreign custody element was appropriate prior to *Technodyne*, after *Technodyne*, the government cannot satisfy its burden of proof by pointing to the absence of evidence on this (or any) element. The District Court's reliance on *Collazos* therefore was misplaced.

In short, the total lack of evidence before the District Court on foreign custody was insufficient to support the conclusion that Terekhova was not in foreign custody, and the District Court's conclusion otherwise contravenes this Court's governing law. This error alone is sufficient to overturn the District Court's order.

**D.** **The District Court's Conclusion that Terekhova Has Knowledge of the Indictment Against Her Is Based on a Clearly Erroneous View of the Evidence**

With respect to another element necessary to establish disentitlement — that "the claimant must have had notice or knowledge of the warrant," *Technodyne*, 753 F.3d at 378 — the District Court determined that Terekhova had knowledge of the indictment against her (and the warrant for her arrest) on two bases: media coverage and attorney communications. Each basis is flawed.

The District Court first pointed to the media coverage generated by the unsealing of the indictment naming Derkach in December 2022 to suggest Terekhova's awareness of the criminal case. The District Court ignored, however, (1) that the indictment named only Derkach and not Terekhova; (2) that the media coverage cited by the government (A-200–34) was exclusively English-language coverage (and not Ukrainian- or Russian-language coverage), and thus it is not clear that "th[e] news" of the indictment "had reached" Terekhova, *Soulbury*, 554 F.3d at 130; and (3) that by December 2022 Derkach and Terekhova had been divorced for nearly three years, and thus there is no reason to believe that Terekhova would have been aware of her ex-husband's indictment.[8]

_____

[8] As noted *supra* Point I.A, to the extent the District Court relies on the government's assertion that "the divorce was a sham" (SPA-7) to suggest that Terekhova was aware of the unsealing of Derkach's indictment, that is without credible (let alone sufficient) record basis.

Apparently recognizing the lack of evidence of Terekhova's actual knowledge of the indictment against her, the District Court also found that civil counsel in the District Court (and thus Terekhova herself) was aware of the January 2023 Indictment naming Terekhova in light of a February 2023 email exchange in which the government stated to counsel, "I am the AUSA handling the *Derkach criminal matter*. I understand you are representing [] Terekhova on some related civil matters. Are you representing [Terekhova] on the *criminal case* as well?," and counsel answered, "I'm your huckleberry. Let me know how I can be of service." (A-384 (emphasis added).) The District Court viewed counsel's answer as indicating counsel's representation of Terekhova in the "criminal case" (*i.e.*, the "*Derkach* criminal matter"), and thus showing Terekhova's knowledge of the Indictment *naming her*. But a natural reading of counsel's colloquial answer — where counsel was unaware of the criminal case against Terekhova — is that counsel merely intended to confirm the AUSA's assertion that counsel was "representing [] Terekhova on some related civil matters." In fact, the next day, when the government asked whether counsel was "aware of the superseding indictment" naming Terekhova and the "arrest warrant" against her, counsel responded that he "had *not* realized," a response that corroborates that counsel does not represent Terekhova in the criminal case against her (and no counsel has appeared for her in that matter). (A-383 (emphasis added).) Where a lawyer does

47

not represent a party in a criminal case, the party cannot be charged with notice of facts about the criminal case through that lawyer. *See Soulbury*, 554 F.3d at 128 (where "attorneys did not represent" individual, and "expressly disavowed representation of [the individual] to the government," the individual "cannot be charged with notice through them").

In short, the evidence on this element too was insufficient to support the conclusion by a preponderance that Terekhova had notice of the indictment against her, and the District Court's conclusion otherwise was based on a clearly erroneous finding. This error alone, like the foregoing errors, is also sufficient to overturn the District Court's order.

*   *   *

For all of the foregoing reasons, the District Court abused its discretion in granting the government's motion to strike — and therefore disentitling Claimants from asserting their claims — because each of the determinations upon which the District Court rested its decision was based on clearly erroneous factual findings and a misapplication of governing law. This Court should reverse.

**POINT II**

**The District Court Abused Its Discretion By Failing to Conduct the Required Discretionary Analysis**

Having determined (incorrectly) that the government satisfied each of the prerequisites necessary for fugitive disentitlement, the District Court was required

48

under Section 2466 and this Court's precedent to exercise its discretion to consider whether it would disallow Claimants from asserting their claims. *See* 28 U.S.C. § 2466 (A "judicial officer *may* disallow a person from using the resources of the courts of the United States [on the basis of fugitive disentitlement] . . . .") (emphasis added); *Collazos*, 368 F.3d at 198 (noting that "[Section] 2466 does not mandate disentitlement; the ultimate decision whether to order disentitlement in a particular case rests in the sound discretion of the district court"); *see also Salti*, 579 F.3d at 666 (distinguishing a district court's "discretionary analysis" from its "determin[ation] that all five elements for fugitive disentitlement had been satisfied"). As this Court put it: "[T]he [district] court has discretion not to order disentitlement, and the government is thus never entitled to prevail under § 2466 strictly as a matter of law." *Technodyne*, 753 F.3d at 382.

Here, the District Court conducted no discretionary analysis whatsoever. The District Court simply held that "[t]he Government's motion to strike the claims of [Claimants] is granted *because* the Court finds that all prerequisites for fugitive disentitlement have been satisfied." (SPA-15 (emphasis added).) But the (incorrect) determination that Terekhova "is a fugitive" under Section 2466 does not answer the question whether the District Court should have exercised its discretion to disentitle Claimants.

49

There was good reason here for the District Court to exercise its discretion *not* to disentitle Claimants, in view of the paucity of evidence the government submitted. By contrast, in *Technodyne*, this Court affirmed the district court's discretionary determination to disentitle the parties there without a full hearing because the district court "received numerous submissions" and "heard extensive argument," such that the district court was able to make all the necessary findings "on the basis of the parties' presentations." In the present case, unlike in *Technodyne*, rather than conducting a careful and thorough proceeding, the District Court did not even hold oral argument on the matter. (A-7 (minute entry dated 12/11/2023).)

In addition, in *Collazos*, this Court specifically noted that Section 2466 does not violate due process because it does "not *require* the district court to order disentitlement," 368 F.3d at 204 (emphasis added), which means that the discretionary inquiry is essential to ensuring Section 2466's constitutionality. The District Court's failure to conduct the discretionary analysis was error.

Accordingly, to the extent this Court does not reverse the District Court's disentitlement order, the Court should at a minimum vacate with instructions that the District Court conduct the required discretionary analysis. *See United States v. $610,210 in United States Currency*, No. 21-CV-4854 (KPF), 2022 WL 1125980, at *2 n.3 (S.D.N.Y. Apr. 15, 2022) ("The record of Claimant's criminal case

suggests that the requirements of Section 2466 may, indeed, be satisfied. Nonetheless, the Court determines, in its discretion, not to dismiss Claimant's motion on disentitlement grounds."); *United States v. Cornelson*, 595 F. Supp. 3d 265, 272–73 (S.D.N.Y. 2022) (concluding on discretionary analysis that disentitlement not appropriate); *United States v. Biba*, 395 F. Supp. 3d 227, 239–41 (E.D.N.Y. 2019) (noting discretionary nature of fugitive disentitlement doctrine and declining to apply it in dismissing legally insufficient indictment).

## POINT III

### The District Court Violated Claimants' Due Process Rights By Failing to Rule on Claimants' First-Filed Motion To Dismiss

Not only did the District Court abuse its discretion by granting the government's motion to strike on the basis of an insufficient record and contrary to governing law, but the District Court separately violated Claimants' due process rights when it refused (at the government's request) to consider Claimants' motion to dismiss at all, which Claimants filed months *before* the government filed its motion to strike.

It is well-established that disentitlement — which disallows a property holder from asserting claims over property — "is a sanction 'most severe.'" *Bescond*, 24 F.4th at 768 (quoting *Degen v. United States*, 517 U.S. 820, 828 (1996)). Because disentitlement "heavily burdens [a defendant's] exercise of the due process right to defend herself in court," *id.* at 767 (collecting cases), the

51

Supreme Court has made clear that the "'right to a hearing to contest the forfeiture of property[] [is] a right secured by the Due Process Clause,'" *id.* (quoting *Degen*, 517 U.S. at 820–21) (original alterations omitted); *see $40,877.59 in U.S. Currency*, 32 F.3d at 1157 (noting due process concerns raised by fugitive disentitlement). The fundamental principles of due process prevent the government from forfeiting property absent appropriate procedure.

Here, Claimants should have been able to test the legal sufficiency of the factual allegations asserted against them in the Complaint before being forced to defend a motion to strike. That is particularly the case in the civil forfeiture context, where the Complaint must satisfy not only the general pleading standard of Rule 8 of the Federal Rules of Civil Procedure, but also the "more stringent" standard of Rule G of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions. *United States v. JP Morgan Chase Bank*, No. 13-CV-1363 (LEK), 2015 WL 1820042, at *4 (N.D.N.Y. Apr. 22, 2015) (quoting *United States v. Premises & Real Prop. at 4492 S. Livonia Rd.*, 889 F.2d 1258, 1266 (2d Cir. 1989)); *see United States v. A Red Volvo Tractor*, No. 23-CV-751 (BKS), 2024 WL 1345526, at *5 (N.D.N.Y. Mar. 29, 2024); *United States v. $263,327.95*, 936 F. Supp. 2d 468, 471 (D.N.J. 2013). Under Rule G(2)(f), the government in a civil forfeiture complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial" — a

particularity standard that recognizes "the drastic nature of the civil forfeiture remedy." *United States v. One Tyrannosaurus Bataar Skeleton*, No. 12-CV-4760 (PKC), 2012 WL 5834899, at *3 (S.D.N.Y. Nov. 14, 2012); *see United States v. Mondragon*, 313 F.3d 862, 864 (4th Cir. 2002) ("A civil forfeiture complaint . . . must meet the particularity in pleading requirement [now codified in Rule G(2)(f)]."). Where the government fails to meet the stringent standard of Rule G(2)(f), courts have held that civil forfeiture complaints failed to state a claim. *See, e.g.*, *A Red Volvo Tractor*, 2024 WL 1345526, at *8 (denying government's motion for default judgment); *United States v. All Funds on Deposit in Lee Munder Wealth Planning Resource Account*, 137 F. Supp. 3d 125, 129–30 (D. Mass. 2016) (dismissing complaint with prejudice).[9]

But Claimants here were not given the opportunity to test the legal sufficiency of the Complaint under Rule G(2)(f). Instead, after Claimants filed their motion to dismiss (A-86), the government convinced the District Court to

---

[9] In *Collazos*, this Court noted that Section 2466 "does not violate due process by depriving a forfeiture claimant of property without a hearing," because "statutory disentitlement is itself preceded by notice and a hearing." 368 F.3d at 205. Here, unlike in *Collazos*, the District Court imposed statutory disentitlement based on the papers, after canceling oral argument without explanation (A-7), and thus did not even offer an adequate "hearing" on statutory disentitlement, much less on the earlier-filed motion to dismiss. In any event, nothing about *Collazos* suggests that an earlier-filed motion to dismiss should not be heard prior to a Section 2466 motion, or that a "hearing" on statutory disentitlement somehow obviates the need for a district court to hear a prior motion to dismiss.

hear its fugitive disentitlement motion instead and to terminate the motion to dismiss (A-6 (minute entry dated 06/05/2023)). The unfair result is that the District Court (improperly) granted the government's motion to strike — thus disentitling Claimants — without ever having considered whether the government's factual allegations even pass muster under Rule G.

As noted, there is good reason to believe that the allegations in the Complaint do not survive scrutiny under Rule G(2)(f). (A-88.) The government seeks forfeiture of the Assets on the basis that Claimants and/or the Assets are involved in a money laundering violation (18 U.S.C. §§ 1956, 1957), a "proceeds traceable" violation (18 U.S.C. § 1344 and/or 50 U.S.C. § 1701), or a violation of 31 U.S.C. § 5335. (A-9–11, 30–31.) But as explained at length in the District Court, the Complaint does not specify what transactions it alleges constitute money laundering; does not specify how any alleged transaction involved property derived from specified unlawful activity (particularly given that the primary transactions took place in 2013 and Derkach was not sanctioned until 2020); does not allege that Claimants or the Assets were themselves sanctioned; does not sufficiently allege (let alone with the requisite specificity) that Claimants or the Assets were controlled by a sanctioned individual[10]; does not specify what misrepresentations

---

[10] Although the government argued in its motion-to-strike papers before the District Court that Derkach and Terekhova's divorce was a "sham" (and thus that Derkach, a sanctioned individual, had an interest in the Assets) (A-176 n.1), that

Derkach and Terekhova allegedly made (or caused to be made) to financial institutions; and does not specify how any of the Assets constitute "proceeds" of an IEEPA or other violation.

In light of these fundamental failings, the Complaint does not sufficiently state a civil forfeiture claim under Rule G(2)(f) and should have been dismissed. *See, e.g.*, *United States v. Two Condominiums*, No. 21-CV-4060 (CRB), 2021 WL 3810273, at *4 (N.D. Cal. Aug. 26, 2021); *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 13–16 (D.D.C. 2013). Because the District Court failed to consider the legal sufficiency of a (defective) Complaint, and because the District Court instead (improperly) granted the government's motion to strike, a legitimate property owner has been unfairly disentitled from its claim to property without due process. *Cf. In re Hijazi*, 589 F.3d 401, 407–08 (7th Cir. 2009) (reasoning that because a foreign defendant was "under no obligation to travel to the United States," mandamus was justified to compel a ruling on motions to dismiss). This Court should, at a minimum, vacate the District Court's ruling on the motion to strike and remand.

---

argument is tellingly not alleged in the Complaint and, in any event, is baseless for the reasons explained *supra* Point I.A. Terekhova, who is not sanctioned (and who is not alleged to have been involved in the activity for which Derkach was sanctioned), is the sole shareholder of 7D. (*E.g.*, A-272, 274.)

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse the District Court's disentitlement order. Even if this Court does not reverse, at a minimum, this Court should vacate that order and remand with instructions that the District Court conduct the required discretionary analysis and consider Claimants' motion to dismiss.

Dated:      June 24, 2024
             New York, New York

Respectfully submitted,


By:   */s/ Brian A. Jacobs*

BRIAN A. JACOBS
MORVILLO ABRAMOWITZ
  GRAND IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9000
bjacobs@maglaw.com

– and –

RYAN P. POSCABLO
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
rposcablo@steptoe.com

*Attorneys for Claimants-Appellants*

<u>**CERTIFICATE OF COMPLIANCE**</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,722 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated:      June 24, 2024
            New York, New York

By: _/s/ Brian A. Jacobs_

# SPECIAL APPENDIX

**i**

## TABLE OF CONTENTS

**Page**

Memorandum & Order of the Honorable Dora L.
  Irizarry, dated and filed on March 25, 2024,
  Appealed From ...................................................... SPA-1

SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,                       :
                                                :
                          Plaintiff,            :
                                                :      **MEMORANDUM & ORDER**
              -against-                         :      **22-cv-7410 (DLI)(PK)**
                                                :
REAL PROPERTY AND PREMISES KNOWN AS :
432 NORTH OAKHURST DRIVE,                       :
CONDOMINIUM UNIT 103, BEVERLY HILLS,            :
CALIFORNIA 90210, AND ALL PROCEEDS              :
TRACEABLE THERETO;                              :
                                                :
REAL PROPERTY AND PREMISES KNOWN AS :
432 NORTH OAKHURST DRIVE,                       :
CONDOMINIUM UNIT 203, BEVERLY HILLS,            :
CALIFORNIA 90210, AND ALL PROCEEDS              :
TRACEABLE THERETO;                              :
                                                :
ANY AND ALL FUNDS ON DEPOSIT IN STIFEL :
NICOLAUS & CO. ACCOUNT NUMBER                   :
ENDING IN 9142, HELD IN THE NAME OF 7D :
BUSINESS BUREAU INC., AND ALL                   :
PROCEEDS TRACEABLE THERETO; and                 :
                                                :
ANY AND ALL FUNDS ON DEPOSIT IN                 :
CITIZENS BUSINESS BANK ACCOUNT                  :
NUMBER ENDING IN 7135, HELD IN THE              :
NAME OF 7D BUSINESS BUREAU INC., AND            :
ALL PROCEEDS TRACEABLE THERETO                  :
                                                :
                          Defendants *In Rem*.  :
------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

In this civil forfeiture action, Plaintiff, the United States of America (the "Government"),

moves to strike the claims of 7D Business Bureau, Inc. ("7D") and 73DT Business Properties,

LLC ("73DT") (collectively "Claimants") under the Civil Asset Forfeiture Reform Act of 2000

("CAFRA") specifically pursuant to CAFRA's fugitive disentitlement statute, codified at 28

U.S.C. § 2466.  *See*, Mem. of Law in Support of Mot. to Strike. ("Mot."), Dkt. Entry No. 28-1. Claimants oppose the Motion.  *See*, Mem. of Law in Opp'n. to Gov. Mot. to Strike ("Opp'n"), Dkt. Entry No. 32.  The Government replied.  Reply Mem. of Law in Support of its Mot. to Strike ("Reply"), Dkt. Entry No. 33.  For the reasons set forth below, the Government's motion to strike is granted.

## FACTUAL BACKGROUND

### I.      Seizure of the Properties

On December 7, 2022, the Government filed a complaint seeking forfeiture of: (1) the real property and premises known as 432 North Oakhurst Drive, Condominium Unit 103, Beverly Hills, California 90210, together with its appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits therefrom, and all proceeds traceable thereto ("Unit 103"); and (2) the real property and premises known as 432 North Oakhurst Drive, Condominium Unit 203, Beverly Hills, California 90210, together with its appurtenances, improvements, fixtures, easements, furnishings and attachments thereon, as well as all leases, rents and profits therefrom, and all proceeds traceable thereto ("Unit 203"); (3) funds on deposit in Stifel Nicolaus & Co. in account number ending in 9142 in the name of 7D and all proceeds traceable thereto (the "Stifel Account"); and (4) funds on deposit in Citizens Business Bank in account number ending in 7135 in the name of 7D and all proceeds traceable thereto (the "Citizens Account") (collectively, the "Defendants *In Rem*") as: (1) property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957; or (2) property traceable to such property pursuant to 18 U.S.C. § 981(a)(1)(A); (3) property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1344; and/or (4) 50 U.S.C. § 1705(a) (International Emergency Economic Powers Act ("IEEPA"));

SPA-3

or (5) a conspiracy to commit such offenses pursuant to 18 U.S.C. § 981(a)(1)(C); and/or (6) as property involved in a violation of 31 U.S.C. § 5335, or a conspiracy to commit such violation, and property traceable thereto pursuant to 31 U.S.C. § 5335(e).  Compl. *in Rem* ("Compl."), Dkt. Entry No. 1 at ¶ 5.  The Government's civil forfeiture complaint arises out of the criminal conduct charged against defendants Andrii Derkach ("Derkach") and Oksana Terekhova ("Terekhova") in the criminal action entitled, *United States v. Andrii Derkach and Oksana Terekhova*, 22-cr-432 (DLI) (the "Criminal Case").

## II.    The Criminal Case

Beginning in 1998, with the exception of one year from November 2006 to November 2007, Derkach was a member of the Verkhovna Rada, Ukraine's Parliament, and was a politically exposed person under the Bank Secrecy Act.  Compl. at ¶ 34 and ¶ 19(c).  For most of this time, he was a member of the pro-Russia Party of Regions, until recently when he claimed independent status.  *Id.* at 34.  On September 10, 2020, the Department of Treasury's Office of Foreign Assets Control ("OFAC") sanctioned Derkach as an active Russian Agent.  *Id.* at ¶ 35.  On September 26, 2022, a Grand Jury sitting in this district returned an indictment charging Derkach with: (1) conspiracy to violate IEEPA, in violation of 50 U.S.C. §§ 1705(a) and (c); (2) bank fraud conspiracy, in violation of 18 U.S.C. § 1349; (3) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and (4) engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.  Criminal Case, Indictment, Dkt. Entry No. 3. On January 23, 2023, a Grand Jury sitting in this district returned a superseding indictment adding Terekhova as a defendant and charging her with the same crimes.  *Id.*, Superseding Indictment, Dkt. Entry No. 9.

3

SPA-4

## III.    Acquisition and Maintenance of the Properties and Accounts

In 2013, Derkach and Terekhova purchased and maintained condominiums in Beverly Hills, CA, managing the purchases to conceal Derkach's interest in the transactions.  Compl. at ¶ 39.  This included the use of a multi-tiered structure of corporate entities, 7D and 73DT, which were set up and managed by a United States-based corporate nominee, Yosef Manela ("Manela").  *Id.* at ¶¶ 39-41.  Derkach and Terekhova wired Manela approximately $3.92 million from overseas accounts, $3.2 million of which was used to purchase Unit 103 and Unit 203 on December 6, 2013.  *Id.*, at ¶¶ 46-49.

Manela invested approximately $800,000 of the remaining funds in a Morgan Stanley brokerage account held in the name of 7D, which Manela maintained for Derkach and Terekhova's benefit and used to pay expenses on the condominiums, including taxes, homeowners' fees, and utilities.  *Id.* at ¶¶ 50-52.  Manela later established the Stifel Account in the name of 7D and funded that account with money from the Morgan Stanley account and the client trust account that had received the wire transfers from the overseas accounts.  *Id.* at ¶¶ 54-55.  Manela also established the Citizens Account in the name of 7D using funds from the Stifel Account and used the Citizens Account to make payments for the maintenance of Unit 103 and Unit 203.  *Id.* at ¶¶ 56, 61.

## IV.    Ownership of 7D and 73DT

7D is a California corporation Manela incorporated on or about July 25, 2013.  Wolf Aff. at ¶¶ 11, 12.  Terekhova is 7D's sole shareholder of record.  *Id.*  73DT is a California limited liability company Manela organized on or about July 25, 2013.  *Id.* at ¶¶ 13, 14.  7D is the sole member of 73DT.  *Id.*  While Derkach's interest in and control over 7D and 73DT is disputed, there is no dispute that Terekhova exercises control over 7D and 73DT.  Mot. at 9; Opp'n at 17.[1]

---

[1] For uniformity and ease of reference, all docket entry page numbers refer to the number assigned by ECF.

4

SPA-5

The Government points to evidence of Derkach's and Terekhova's travels and communications to show both of their involvement in the purchase of, and decision making concerning, the property. Reply at 6-7. Throughout the relevant time period, communications among Manela, Derkach and Terekhova indicate that Derkach maintained decision making authority over the Defendants *In Rem*. *See*, Compl. at ¶¶ 39-53 (Defendant Condos) and ¶¶ 54-63 (Defendant Accounts). Derkach and Terekhova viewed potential properties together before purchasing, misrepresented Derkach's identity after one financial institution rejected their application to open an account, and failed to disclose that Derkach was a politically exposed person or Terekhova's relationship to him as a politically exposed person. *Id.* at ¶¶ 40, 42-45, 50. Also of note is a letter from Manela to both Derkach and Terekhova about the instant action dated December 19, 2022, which strongly suggests Derkach's continued interest in the Defendants *In Rem* past the date of his indictment. Opp'n Ex. A, Dkt. Entry No. 32-2.

On January 18, 2023, Claimants appeared and subsequently, on February 21, 2023, filed claims to the Defendants *In Rem*. Not. of Appearance of Ryan Paul Poscablo, Dkt. Entry No. 9; Claim by 7D Business Bureau, Inc., Dkt. Entry No. 17; Claim by 73DT Business Enterprises, LLC, Dkt. Entry No. 18.

## LEGAL STANDARD

CAFRA confers authority on courts to order disentitlement in civil forfeiture cases. *See*, 28 U.S.C. § 2466. In *Collazos v. United States*, the Second Circuit confronted the disentitlement provision of CAFRA in an issue of first impression. 368 F.3d 190, 192 (2d Cir. 2004) ("*Collazos*"). From the statutory language, the Second Circuit derived five prerequisites that courts must consider when ruling on a fugitive disentitlement motion to wit, that: (1) a warrant or similar process has been issued in a criminal case for the claimant's apprehension; (2) the claimant has

5

SPA-6

notice or knowledge of the warrant; (3) the criminal case is related to the forfeiture action; (4) the claimant is not confined or in custody in another jurisdiction; and (5) the claimant is deliberately avoiding prosecution in the United States. *Id.* at 198. The Circuit noted that the statute is designed to prevent "the unseemly spectacle recognized . . . of a criminal defendant who, facing both incarceration and forfeiture for his misdeeds, attempts to invoke from a safe distance only so much of a United States court's jurisdiction as might secure him the return of alleged criminal proceeds while carefully shielding himself from the possibility of a penal sanction." *Id.*, at 200. The Government "bears the burden of establishing the factual prerequisites." *United States v. Technodyne LLC*, 753 F.3d 368, 381 (2d Cir. 2014). However, "even when these requirements are satisfied . . . § 2466 does not mandate disentitlement," and the district court has discretion to make the required findings on the basis of the parties' presentations. *Collazos* at 198; *Technodyne*, 753 F.3d at 382.

## DISCUSSION

I.     **Derkach**

As a preliminary matter, the Government's motion to strike is predicated on both the fugitive status of Derkach and Terekhova, and their joint control over the Defendants *In Rem*. Reply at 2. Claimants' attempts to construe the motion as premised solely on Terekhova's alleged fugitive status are specious, if not downright misleading. *See*, Opp'n at 14. The parties agree that Terekhova is the ultimate beneficial owner of the Defendants *In Rem*. Resp. to Special Interrog. No. 10, Dkt. Entry No. 30-1. However, Claimants dispute whether Derkach has any ownership interest in the Defendants *In Rem*. *See,* Opp'n at 5. Claimants argue that there is no evidence to support Derkach's stake in the Defendants *In Rem*, especially since Derkach and Terekhova

SPA-7

divorced in February 2020. *Id.* at 10. Claimants also attach great significance to the Government's statement that Derkach has no "apparent interest in the property." *Id.* at 14-15.

The Government contends that Derkach had and continues to have interest in and control over the Defendants *In Rem*. Compl. at ¶¶ 64-72. Derkach met with Manela four times, twice in 2013, once in 2015 and once in 2017. *Id.* at ¶ 65. During these meetings, Derkach conveyed the impression that he had decision making authority. *Id.* Statements by Derkach's and Terekhova's daughter indicated that Derkach was an owner of the property, but "her living situation and finances were structured to avoid implicating Derkach or sanctions." *Id.* at ¶¶ 68-69. The Government further contends that the divorce was a sham effectuated for the purpose of concealing Derkach's connection to the Defendants *In Rem* as part of Derkach's and Terekhova's ongoing scheme. Reply at 5-6.

The Court finds that the record establishes that Derkach had and continues to have an interest in the properties. The Government's statements about Derkach's "apparent interest," when read in context, do not constitute a concession that Derkach has no interest in the property, but, instead, are a continuation of the Government's narrative regarding Derkach's and Terekhova's attempts to hide Derkach's interest in the property. *Id.* at 5-6. Even if the Court were to accept Claimants' contentions and find that Derkach has no interest in the property, it would not alter the outcome because the requirements for fugitive disentitlement still are met as to Terekhova.

## II.    Application of Fugitive Disentitlement

The parties do not dispute that two of the five prerequisites for disentitlement are satisfied. Specifically, the parties agree that a court has issued warrants for Derkach's and Terekhova's apprehension in a criminal case and that the criminal case is related to the instant forfeiture action.

*See*, Opp'n at 13 fn. 8 and Reply at 4.  Therefore, the Court focuses its analysis on the remaining three prerequisites contested by Claimants.

### A.        Notice or Knowledge of the Warrant

The Court finds that both Derkach and Terekhova have notice and knowledge of their indictment in the criminal case.  The law does not require that the fugitive be served with actual notice or that he have complete knowledge of all the charges against him, rather it requires that there was sufficient information that would have put the claimant on notice that he was called to answer criminal charges in the United States.  *See*, *United States v. $6,976,934.65, Plus Int. Deposited into Royal Bank of Scotland Int'l, Acct. No. 2029-56141070, Held in Name of Soulbury Ltd.*, 554 F.3d 123, 130 (D.C. Cir. 2009).   Furthermore, it is a "well-established principle that a person is 'considered to have notice of all facts, notice of which can be charged upon the attorney.'"  *Id.* at 128 (quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 634 (1962)) (internal quotations omitted).  Claimants dispute whether Derkach and Terekhova have notice or knowledge of their indictment in the criminal case.  Opp'n at 14-20.  However, the record amply supports such knowledge on the part of both Derkach and Terekhova.

### 1.        News Coverage

Claimants argue that media coverage of Derkach's indictment cannot serve to give Terekhova knowledge of her later indictment.  Claimants correctly note that, "the mere existence of media coverage of the issuance of an indictment is insufficient to satisfy the notice or knowledge element unless accompanied by evidence that the media reached the alleged fugitive defendant wherever he or she was."  Opp'n at 15 (citing *$6,976,934.65, Plus Int.* at 130).  Claimants further argue that the Government presents primarily news coverage of Derkach's indictment, while Terekhova's indictment seemingly generated significantly less interest in the media.  *Id.* at 14 (citing Wolf Aff. at ¶ 6).  While the news coverage of the Derkach and Terekhova indictments was

8

SPA-9

significant and worldwide, the Court does not rely on the news coverage alone in concluding that Derkach and Terekhova have notice or knowledge of their indictment.

### 2. Attorney Notice or Knowledge

Claimants challenge the Government's argument that Derkach and Terekhova have notice or knowledge of their indictment and warrants because Terekhova's lawyers were aware of the warrant. Opp'n at 16-19. Claimants dispute the meaning of an email exchange between Assistant United States Attorney Artie McConnell ("AUSA McConnell") and Claimants' attorney Ryan Poscablo. *Id.* at 16. Mr. Poscablo was asked by AUSA McConnell in an email: "Are you representing [Terekhova] on the criminal case as well?" *Id.* Claimants contend that Mr. Poscablo's response, "I'm your huckleberry. Let me know how I can be of service," "was, at best, merely an acknowledgement that Mr. Poscablo was representing Terekhova in her capacity as the owner of the corporate entities in connection with the civil forfeiture case." *Id.* 16-17. The Court disagrees with this disingenuous argument and finds that the most natural reading of the exchange is that Mr. Poscablo confirmed his representation of Terekhova in the criminal case.

Even if the Court were to accept Claimants' interpretation of the exchange, it is undisputed that counsel for Claimants confirmed representation of Terekhova in the civil case via email. Opp'n Ex. C, Dkt. Entry 32-4. Terekhova's counsel in this civil forfeiture action also requested, and received, copies of her indictment. Mot. at 16 (citing McConnell Decl. at ¶ 6). Thus, the record establishes that Terekhova is aware of her criminal indictment because her lawyers were aware of her it. *See, $6,976,934.65, Plus Int.* at 128.

Also relevant is Zaourbek Sagaev's ("Sagaev") role in this case and the timeline of his involvement as an officer of Claimants. Sagaev became the sole officer and director of Claimants sometime between February 2, 2023, when Yosef Manela filed paperwork and February 27, 2023,

9

when Sagaev filed his paperwork.  *Compare*, O'Connor Decl. Ex. C *with* O'Connor Decl. Ex. D; and *compare*, O'Connor Decl. Ex. E *with* O'Connor Decl. Ex. F.  Steven Welk, who represents Claimants in this case, filed the paperwork on behalf of Sagaev on February 27, 2023.  *See*, O'Connor Decl. Ex's D and F.  At the time of that filing, Mr. Welk had notice of the instant forfeiture action, as revealed by his email of January 17, 2023 in which he confirmed representation of Claimants and Terekhova.  Opp'n Ex. 3., Dkt. Entry 32-4.  While there is nothing in the record explicitly indicating who directed Mr. Welk to place Sagaev in charge of Claimants, it strains credulity that he would not have informed Terekhova at least of this change and the reasons for it, namely, her indictment and Manela's resignation.  Indeed, as her attorney, he would have been obliged to do so.  *See*, State Bar of California Rules of Professional Conduct, Rule 1.4 Communication with Clients.  Therefore, the Court can conclude from the facts and circumstances here that Terekhova has knowledge of her indictment.

The Government cites *Rogers v. Palmer* for the proposition that "the law presumes that an attorney communicates notice of any matter within the scope of representation to the client."  Mot. at 18 (citing 102 U.S. 263 (1880)).  Claimants argue that this proposition is inapplicable because in that case, the attorneys "for one of the fraudsters was actively and affirmatively involved in the underlying misconduct."  Opp'n at 17 (citing *Rogers v. Palmer*, 102 U.S. at 267-68).  Claimants' purported basis for distinguishing the case is unpersuasive.  In *Rogers v. Palmer*, the involvement of the attorneys in the scheme was relevant as to *what* knowledge could be imputed to their client, not *whether* that knowledge could be imputed. 102 U.S. 263, 267–68 (1880).  Thus, the proposition that "the law presumes that an attorney communicates notice of any matter within the scope of representation to the client" holds true here.

10

Claimants also maintain that the statutory forfeiture framework does not "support the proposition that notice of a parallel criminal prosecution to an attorney of a civil forfeiture claimant is sufficient to satisfy the notice or knowledge element, even though the opposite is true." Opp'n at 17. Specifically, while Rule G(4)(b)(iii)(B) of the Supplemental Rules allows the Government to notify the attorney "representing a potential claimant with respect to the seizure of property or in a related investigation, administrative forfeiture proceeding, or criminal case," "there is no corresponding provision that permits notice of criminal proceedings or an arrest warrant to be accomplished through notice to the attorney for a potential civil forfeiture claimant." *Id.* at 17-18. Claimants argue that, in other cases where this method of notice was effective, "the attorney's representation of the alleged fugitive was directly related to the criminal case." *Id.* at 18 (citing *Collazos* at 201; *United States v. Krishana's Real and Personal Property*, 469 F. Supp.3d 481, 488-89 (E.D.N.C. 2020) ("*Krishana's*"), and *United States v. All Right, Title and Interest . . . Trump World Towers*, 2004 WL 1933559, *2 (S.D.N.Y. Aug 31, 2004) ("*Trump World Towers*").

The Court does not read the cases relied on by Claimants to require that an attorney's representation be related to the criminal case. *Collazos* and *Trump World Towers* quite clearly lend no support to Claimants' proposition because, in those cases, the fugitive's knowledge of the warrant was conceded by their lawyers. In *Collazos*, the Second Circuit found that the claimant was aware of warrants because her lawyers acknowledged her awareness. *Collazos* at 201 (fugitive's awareness shown by "[h]er forfeiture counsel's reference to it as an excuse for her failure to appear" and "the unsuccessful efforts of another attorney acting on her behalf in October 2001 to negotiate a surrender.").

Similarly, in *Trump World Towers*, the claimant did not even dispute that he was aware of the arrest warrant. 2004 WL 1933559 at *2 (S.D.N.Y. Aug 31, 2004) ("Barbosa, through his

11

counsel, does not dispute that he is aware that a warrant was issued for his apprehension."). In fact, Claimants' mischaracterization of the notice finding in *Trump World Towers* is puzzling when the court there explicitly stated that notice was not disputed. If there is even an implication that the method of notice was relevant to the decision, the Court cannot find it. Such a wild misreading of a straightforward decision begs the question whether Claimants have intentionally misrepresented the law.

Claimants neglect to mention that, while the attorney in *Krishana's* represented the claimant in the criminal case, *the same attorney* represented the claimant in the forfeiture case. 469 F. Supp.3d at 488-89 (E.D.N.C. 2020). The court found representation in the forfeiture case (as well as the criminal case) relevant to the notice requirement. *Id.* (holding claimant had notice "by virtue of being represented by an attorney in the criminal case . . . and by notice of appearance of the same attorney in the instant case, where the government has included the criminal case indictment as an exhibit to its complaint.") *Id.* Thus, none of Claimants' cited cases support the proposition that an attorney's representation in the civil matter also must be related to the criminal case in order to satisfy the notice requirement.

Notably absent from Claimants' arguments is any assertion that Derkach or Terekhova do not actually know that they have been indicted. *See*, Opp'n at 14-20. The Government's contentions are further supported by Derkach's and Terekhova's pattern of travel and behavior discussed *infra*. Therefore, the Court finds that there is sufficient basis to conclude that both Derkach and Terekhova have notice of their indictments in the criminal case.

**B.    Confinement in Another Jurisdiction**

Claimants dispute whether the Government has shown that Derkach and Terekhova are not subject to confinement in another jurisdiction. Opp'n at 16-17. In support of this contention,

SPA-13

Claimants focus on the case law the Government cites in support of a finding on this element specifically, *United States v. $6,976,934.65 Plus Interest*, 478 F. Supp.2d 30, 40-41 (D.D.C. 2007) ("*$6,976,934.65 Plus Interest*"). *Id.* Claimants take issue with the Government's use of *$6,976,934.65 Plus Interest* to support the assertion that "[c]ourts find this prong to be established when there is no suggestion that the individual at issue is in custody somewhere." Opp'n at 20 (quoting Mot. at 14).

Contrary to Claimants' contention that there is no other case law in accord, the Second Circuit made a nearly identical finding in *Collazos* in affirming the district court's order of disentitlement. There, the Second Circuit found "ampl[e] support[]" in the record that all statutory requirements were satisfied, including the fourth element, where "nothing in the record indicate[d] that [the Claimant] was ever confined, incarcerated, or otherwise unable to travel to the United States of her own volition[.]" *Collazos* at 201. Of course the burden never falls on Claimants to disprove any of requisite elements of fugitive disentitlement. *Technodyne LLC*, 753 F.3d at 381. Much like in *$6,976,934.65 Plus Interest* and *Collazos* nothing in the record here indicates that either Derkach or Terekhova is in detention anywhere. Wolf Aff. at ¶ 19. Therefore, the Court finds that this element is satisfied.

### C.     Deliberate Avoidance of Prosecution

CAFRA lays out three circumstances by which the Government might show that a criminal defendant has deliberately avoided prosecution, namely by leaving the United States, refusing to enter or reenter the United States or by otherwise evading the jurisdiction of a United States court. *Collazos* at 200; 28 U.S.C. § 2466. "The claimant's intent may be assessed in light of 'the totality of [the] circumstances.'" *Technodyne*, 753 F.3d at 381. Furthermore, "[e]vasion is an expansive concept encompassing any 'craft or strategem . . . to avoid facing up to something.'" *Collazos* at

13

200 (citing *Webster's Third New International Dictionary,* at 786) ("While it is broad enough to include the deliberate flight identified in subpart (A) and the refusal to "enter or reenter" identified in subpart (B), the use of the introductory word "otherwise" indicates that the evasion referred to in subpart (C) reaches beyond these specific examples to myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court where a criminal case is pending against him."). Courts rely on travel history, for example, to determine whether a claimant is evading prosecution. *See, United States v. 2005 Pilatus Aircraft, Bearing Tail No. N679PE*, 838 F.3d 662, 664 (5th Cir. 2016).

Here, the pattern of behavior of Derkach and Terekhova in the years leading up to the sanctions and the indictment and the change in their behavior following the indictment strongly suggest that they are evading criminal prosecution. The record shows that, between the years of 2013 and 2020, Derkach and Terekhova were frequent visitors to the United States. Wolf Aff. at ¶ 20. They purchased properties where members of their family resided and where Derkach and Terekhova indicated they intended to reside themselves. *Id.*; Compl. at ¶ 64.

This contrasts sharply with their behavior following the issuance of sanctions. The same day that Derkach was sanctioned, their younger daughter moved out of the defendant *in rem* condominium in which she was living. *Id.* at ¶ 15. The record establishes that, since the issuance of the criminal indictments, Derkach and Terekhova have not returned to contest or answer the criminal charges. Their failure to return appears to be deliberate in light of their past pattern of behavior and actions during the civil forfeiture proceedings. Therefore, the Court finds that the fifth prerequisite for disentitlement has been met.

14

SPA-15

## CONCLUSION

The Government's motion to strike the claims of 7D and 73DT is granted because the Court finds that all prerequisites for fugitive disentitlement have been satisfied.  Both Derkach and Terekhova are welcome to contest this forfeiture action by appearing before the Court.


SO ORDERED.

Dated:  Brooklyn, New York
            March 25, 2024

/s/
_____
DORA L. IRIZARRY
United States District Judge
